A. F. REEDER et al., Appellees, v. ARTHUR LUND, Appellant, et al., Appellees.

No. 40582.

APRIL 10, 1931.

REHEARING DENIED OCTOBER 31, 1931.

C. O. Boling, J. C. France, and E. A. Johnson, for appellant.

Hamiel & Mather, Henry L. Huber, and C. J. Lynch, for appellees.

MORLING, J.—Defendant Arthur Lund is an attorney at law and during the times in controversy was acting as attorney and advisor of plaintiff's ward, John W. Reeder. Reeder was at the time of the trial, June or July, 1929, about 93 years of age. Plaintiffs base their suit upon allegations of mental incompetency and of express and implied fraud.

Lund since October, 1926, had had a power of attorney signed by Reeder, the provisions of which are not in evidence. At various dates in 1927 and 1928 Reeder signed numerous promissory notes payable to Lund for various sums ranging from a few dollars up to $4200, among them three notes dated October 23, 1928, one for $1179.62, one for $3,000, one for $2500, a total of $6679.62, secured by real estate mortgage to Lund of the same date signed by Reeder and purporting to "be security for other indebtedness and also for future indebtedness to Arthur Lund." Under date of January 26, 1929, February 5, 1929, March 27, 1929, John W. Reeder signed three warranty deeds describing various tracts of farm and town property, each stated to be for One Dollar, and other valuable considerations. The deeds named as grantee Arthur Lund "as trustee with sole and absolute power and exclusive authority to convey an absolute title in fee simple to premises herein described without any restrictions or reservations whatsoever." Under date of March 27, 1929, Reeder and Lund signed and acknowledged a trust agreement, which recited that Reeder was the owner of real property requiring considerable time and attention for its proper management; that he desired to make provision for the

disposition of his estate; that he had deeded to Lund real estate known as the Reeder Block, Reeder farms and the Reeder residence; that such real estate should be in trust for the persons and purposes therein enumerated. The trust agreement is very elaborate, conferring on Lund power to manage, collect income, apply net income on principals of mortgages, including any that Arthur Lund might find it necessary to place as provided; ''that the notes and other accounts and moneys due Arthur Lund personally or otherwise shall be paid by the use of the income of the premises herein described and that if the said Arthur Lund desires said moneys out of said notes or accounts or other matters that he shall have the right to mortgage real estate to borrow money to pay the same, and said mortgage or mortgages so executed shall be considered and construed the same as if executed by me personally and shall be paid from the income referred to herein the same as other mortgages. The said Arthur Lund, as trustee, * * * shall not execute any bond for the performance of his duties hereunder so long as he holds notes or other indebtedness against the said J. W. Reeder or mortgages on real estate in or about the aggregate amount of four thousand dollars, but should said indebtedness to him be reduced below that amount said Arthur Lund shall execute a surety bond in the sum of five thousand dollars, for the use and benefit of the said J. W. Reeder. * * *'' It was further stipulated that the title to the premises described in the deeds therein referred to should be absolute in the trustee Arthur Lund without any reservation or restriction. The trust agreement revoked the power of attorney. The petition is to cancel the mortgage and these deeds and agreement and for accounting. Lund answered, in substance, by general denial and afterwards amended setting up loans of various sums to Reeder on notes then held by Lund, namely, note dated September 7, 1928, for $4200, interest 5 per cent; note dated August 18, 1928, for $1000, 5 per cent; note dated April 7, 1928, for $600, 6½ per cent; two notes for $500 each dated September 3, 1927, 5 per cent; note of $50 dated August 18, 1928, 6 per cent; note for $75 dated February 28, 1929, signed by John W. Reeder and Arthur C. Reeder, 7 per cent. Also three notes secured by mortgage, all dated October 23, 1928, to wit, one note for $3000 on which there is a credit of $2000 under date of December 20, 1928, leaving a balance

due thereon of $1000 and interest; one note for $2500 upon which there is a credit under date of December 20, 1928, of $1837, leaving a balance due of $663; one note for $1179.62. The defendant alleged that there was unpaid on the mortgage notes $2842.62, with interest, and on the unsecured notes $6925, with interest, and that he was not indebted to Reeder in any sum. The answer also alleged that at the time the mortgage was given John W. Reeder requested defendant to take the note of Arthur C. Reeder for $850 and if collected from Arthur the amount paid was to be credited on the mortgage. By amendment to petition plaintiff asked cancellation of all notes.

The printed abstract and amendment contain more than 800 pages, a lengthy statement of which will not be attempted.

There was the usual conflict of opinion between witnesses, expert and lay, concerning the mental competency of the ward. There had been for a period of two years and more prior to the signing of the trust agreement discussions between Reeder and Lund concerning the disposition of Reeder's estate in which references to possibility of future guardianship had been made. It is not disputed, in fact Lund asserts that repeated explanations to Reeder of various matters under discussion had been made. We shall not undertake to determine whether or not at the particular times in controversy the ward had sufficient mental capacity to contract. We have two first hand pictures of his mental condition, one furnished by a letter written by him March 12, 1929, to a son, and the other his testimony given on the witness stand in this case in June, 1929. The ward had attended the presidential inauguration on March 4, 1929, and had had the honor of holding the President's hat while on the platform. The letter reads: ''Art says it was Grant (the ward's son) that was with me at the Vice Presidents while they were elected and went with me to the Presidents platform and saw me go to him and shake his hand and bid him good by & Mrs. Rosevelt or Mrs. Hoove — also — Now when I arrived at the platform and during the Address I was at the opposite end of the Platform from Hoover as directed by the Platform Chairman and at once told to go forward & meet the President—at once I did as ordered & met the President & shook his hand & bid him good by &c & at once met Mrs. Hoover as I retired from the platform as the people around surrounded. Dr. Grant (the

ward's son) did you see it all—or was Dr. Wm (another son) behind me, I do not know exactly but people called me at once Mr. J. W. Reeder & shook my hand very kindly. I do not know but Art (a son) Said you had followed me from the Vice Presidents office. I was helped Stand on a barrell quite a while in the Vice Presid Presidents room during the election and at once proceeded when they were done to the Presidents platform * * *'' J. W. Reeder was a witness on the trial of this case. He denied remembering any promissory notes or bonds given to Lund, denied ever signing any notes to Lund. Testified that he had loaned Lund money at different times.

"Q. Do you remember anything about any trust deed? A. Never heard of such a thing, and when that word came to my mind from Mr. Hoover when I came from the south a few days afterward, he says, 'J. W., they have got you on for a talk,' he says, 'we are going to make a president of you' and I says, 'I guess it will,' and I just met Mr. Hoover and he says, 'they have enough presidents.' Q. Now, there appears to be filed of record a deed to Arthur Lund as trustee, marked Exhibit 8, it consists of five typewritten pages and purports to bear your signature and that of Mr. Lund, and purports to be acknowledged by you and Mr. Lund before Hollyce Roberts, notary public? A. I never saw this one, I had never signed this one before I—I said and after the regular statements had been made, now I could not say this was done by an artist, and I could not say but what she printed that correctly after me, but it is not quite correct, the president did not sit at my right hand when it was done or he would have had it done better, now as to the line below, I said, if there is anything on your mind, President, that would seem necessary to change, it will be necessary to change, it will be all right with me, but he did not change it and then he gave me his name to sign, also president occupying the chair at that time, both presidents signed it, but I did not sign it just at that moment, I had signed it though, but that I never signed, that never passed through my hands. Q. When you were talking about having signed something, what was it you thought you signed? A. I signed something in regard to my occupying a position on the board and being present and my two sons with me, and he gave that promise and he fulfilled it, and I should have brought them, I have got

a good many more friends that wants to know Mr. Hoover has asked me for one and I have got one for those gentlemen here. * * * Q. Did you ever have any intention of turning over to Mr. Lund as trustee any of your real estate or property? A. I had no such thought in my mind, I am a pretty stubborn fellow, I will do my own business, and have done it, except through my sons and neighbors, of course I ask a man occasionally if he has got something to sell. Mr. Hoover and I transacted a great deal of business in that way. No, I never thought of such a thing. * * * No, sir, I never seen those notes at all, they never came into my hands until now, I never saw them at all, he would have known better than to pass them over to me, I don't know, he never asked me anything for this reason, he wanted me on account of Mr. Hoover or these gentlemen here, and when he wanted money if I had it, he knew he would get it for a short time, but he would not get it on these conditions, that I would have paid for it at that time if I would give him interest, I had money, plenty, coming in from my different lines of business at that time, I had money, and sometimes I could not get the money just the day he wanted it perhaps, but he got it soon, because I could get this money I had, I was handling live stock and handling a great deal of it, and it took a great deal of money to do it, and I never wanted to get rid of it, had to have money. * * * I signed a paper, but I signed it to Cornell College for a business transaction of the college and I was asked about it to-day, it was to secure my daughter's tuition and that is paid, I gave her the money and she got the paper, and that is all there was to it. * * * Now in regard to those contracts that the government makes between the men that has lived his time out there, some of the old men did that, got your land warrant, that is all you paid for it, now he has got two or three of those away from me. * * * Q. Arthur has been with you looking after some of your business the last year or two? A. Well, he has gone into an enterprise to waken the people up at the upper end of the town.''

One of the deeds and the trust agreement in question were signed after the date of the letter, the other deeds within two months preceding that date. The notes for $6679.62 and the mortgage securing them were signed within five months preceding the date of the letter. At the time of signing the letter

and at the time of giving his testimony three or four months later Reeder's mental operations were manifestly incoherent. His memory failed him and he was laboring under delusions of a grandiose type. This condition, on the record before us, cannot be held to have been a sudden manifestation or break with the past.

Defendant Lund at the time of the trial was about 35 years of age. He graduated in law in 1916, located first at Marion and later in Tipton—Reeder's place of residence—in 1917. Business relations between the ward and Lund began in 1920. Lund testified to making numerous and large loans to Reeder in currency. He testified:

"The $2000 in currency in 1924 I took out of my safe in my office. My safe was an old-fashioned large safe. This $2000 in currency had been in that safe a long time. There was $4500 in the safe being the accumulations of different deposits. I expect during the summer of 1924, I don't remember just now— quite awhile ago—I had as much as $4500. I was carrying this volume of currency in this safe in my office at the same time that I was paying interest on moneys to the amount of thousands of dollars borrowed at one of the local banks."

He further said:

"The office safe that I kept the $4000 in during the year 1923 was one of those old style large safes. It was probably four feet high, and I presume eighteen inches deep, and probably thirty inches—I don't recall the make of it."

Going back to trace the money which appellant claims he had in his safe in 1924, he testified:

"Q. How much did you have at Iowa City at that time (when a student)? A. I don't just recall the exact amount. I suppose between $500 and a thousand dollars. I don't remember just now. Q. Where did you keep it in Iowa City? A. I had some in my room. As I recall I had some in the envelope I left at one of the banks at Iowa City."

The appellant further testified:

"Q. How much currency did you have at the time of your graduation with your belongings and personal effects in that

house? A. Several hundred dollars, I don't remember just now—it was hidden among my personal belongings in that house. About the time I graduated and started practice at Marion I put it in my safe at Marion. When I moved from Marion to Tipton I brought what currency I had, I don't know how much. It might have been $2500, and it might not have been that much. * * * Those packages that I brought from Marion were not opened for quite awhile. Some of it was opened in 1927. I could not say how much there was in the packages that I opened in 1927 that had been brought from Marion in 1918. Might have been $2000, might have been $2500, I cannot say. * * * Nobody but myself saw it. I was married then but my wife did not see it. When I brought it to Tipton I put it in the safe at the office here. * * * The packages of currency that I brought from Marion in 1918 were some of them not opened until 1927, four or five of them probably."

He further testified:

"I might have owed the Cedar County Bank in 1923, I probably did but I don't remember now. It might have been upwards of $1000, or it might have been less. I don't know. During the same time I think I was owing Wright Brothers $4000. I was owing Elizabeth Burrows or Elizabeth Snyder at that time $700 and paying 6% on it. I think I borrowed some from the three banks in Tipton some time. I don't remember whether it was this particular year or not. At the time that the $4000 was in my safe I might have had a note at the Farmers and Merchants Bank at Marion. It seems to me at that time Frank D. Wingert and I were owing Bruce Lash $2000, drawing 6% interest, I think. There was a Federal Land Bank loan mortgage against the land I referred to of $5000. Some had been paid on it. Probably $4500 on it at that time bearing 5%. I was indebted to my father at that time but I cannot say how much. I gave him a note in 1927 for $4767. * * * I think that I opened the last of the packages that I brought here in 1918 along in September of 1928. I think it was about $500 that I took out of this package."

Appellant further testified:

"The box in which I stated that I kept some currency was

one of those small tin boxes, metal box I suppose you would call it, about ten inches or a foot long. I kept it in the room that we had reserved in the house that Nelson rented. I remember the currency transaction when I took $2000 out of my safe in September, 1924. After taking out this $2000 there was left in the safe $2500 or $3000 more. I probably took out $3000 shortly before to buy Liberty Bonds. I think I had $8000 in currency in the safe at that time that I bought the Liberty Bonds. At times I had as much as seven or eight thousand dollars in currency. Q. And yet you cannot point out a single transaction or point to a single time or place when you got $1 of that seven or eight thousand dollars from any particular bank or institution or person, can you, any record of it? A. Not now. Q. Now you cannot recall of anyone ever being present when J. W. Reeder gave you any notes, other than those mortgage notes of October, 1925, except the one for $475 and the one for about $289; that is true, isn't it? A. Well, I recall there were some others but I don't recall who they were. I did not get the $500 that I spoke about getting from Cedar County during the time I was County Attorney. Q. And that was during 1925 when your whole income for the year 1925 from any and all practice did not amount to a thousand dollars, isn't that true? A. I think it amounted to more than a thousand dollars. Q. How much more? A. Oh, probably $1500.''

He says Reeder did not want the bank to know about his affairs. Reeder, however, was doing an extensive business with the banks, making deposits and drawing cash and Lund was participating therein.

During all of these transactions Lund kept checking accounts with different banks. He says he presumes the balance generally ranged from $100 to $150. He did not just know. In these accounts he deposited collections and other funds belonging to clients and checked against them for his own use. For instance, in the fall of 1924 he was administrator of an estate and something like $3500 of the estate funds came into his possession and was deposited to his own account. He testified, ''Probably that particular money of the trust fund of that estate I was using in payment of my own personal matters and obligations.'' He was then asked: ''Q. Now show me any record anywhere where you had any corresponding amount of money

at any time to take the place of that in the estate. A. Well, I had considerable money in the safe at that time." He says Reeder did not want the bank to know about his affairs. Reeder, however, was doing business at the banks by making deposits and drawing cash and Lund participated to some extent at least in the transaction of Reeder's banking business. During the times here in question his checks, even for small amounts, frequently went to protest. During this time also he was "kiting" checks between the banks in which he was depositing. Based upon his bank statements he estimates that he drew $40,000 out of the three banks during the period in question.

During the period under consideration Lund was owing several thousand dollars to banks and others on which he was paying interest at six and seven per cent. He was owing mortgages on land drawing five per cent. He gave his father in 1927 a note for $4767 and says "that indebtedness might have gone back to 1923." Though he says he got money from his father in purchasing his home for which he paid $5,000 or $6,000, it was mortgaged for $5,500. In the fall of 1924 he went to California with the evident intention of taking up his residence there. At that time attachments were levied on his property. One of the attachment suits was settled by Lund's wife's people. He confessed a judgment. On his return in a few months from California he was owing for law books, claim for which was in the hands of local attorneys and which he paid in small installments. He kept no books but produced a large number of memoranda made on slips of paper claimed to represent transactions with Reeder concerning the execution of the trust agreement in question. Lund was county attorney for four years and engaged in the general practice. He made no income tax returns. He made different estimates as to his earnings. He says that during the four years he was county attorney his salary was $1400, which together with commissions probably averaged $1800 a year and his office practice amounted to $800 or $1000 per year. He furnishes no evidence of his business or family expenses. He testified: "I think I was a little low on the estimate that I made of my fees as an attorney during the four years that I was County Attorney, other than my salary as County Attorney. I would think they would be at least $1000 to $1200 a year in addition to the County Attorney's salary and fees."

No witness was produced who ever saw the currency which Lund claims to have had in his possession. Lund though borrowing money of banks on collateral says he never designated any notes on any property statement. Considerable business with Reeder was by checks. In paying Arthur C. Reeder $850, the amount which he loaned October 23, 1928, later referred to, he made use of checks in small amounts extending over a period of two or three months. Lund testified:

"Q. Do you realize that the total of all your checks and record items which you can produce here and on which you claim any indebtedness arose that is included in your present claim does not amount in the aggregate to over $1500? A. I never figured them up. Q. So you are here claiming $10,000 on loans made in the last two years and you cannot point out any portion of that evidenced by any check, bank record, or anything else that you can refer to except what you have identified here? A. No, sir."

Investigation by plaintiffs of such records as were available, including bank records, fail to disclose receipt by Reeder of the cash payments alleged by Lund to have been made.

While Lund was in the relationship of attorney and confidential advisor to Reeder and had his confidence he obtained from Reeder promissory notes, mortgages, deeds and a trust agreement in respect to Reeder's private affairs and property, which on their face were very beneficial to Lund, and not merely incidental to the relationship. To prevent abuse of such confidential relationship by removing temptation the law presumes such contracts to be fraudulent. Shropshire v. Ryan, 111 Iowa 677; 6 C. J. 686; 2 Pom. Eq., 4th Ed., Sec. 960, et seq.; 2 R. C. L. 966; 1 Id. Perm. Supp. 586. The burden of proving consideration and good faith is upon the attorney. Id. Healy v. Gray, 184 Iowa 111; Haman v. Preston, 186 Iowa 1292.

In his dealings under review Lund was in the exercise of his important office of attorney, which demanded the utmost good faith and fidelity. His client was, to say the least, of manifestly failing mentality. Fiduciaries are required to keep accounts of their trust. Lund is unmistakably dishonest. His testimony as a whole and in its details (except as to relatively few matters in which he is substantiated) is both inherently and circumstan-

tially incredible. Consideration for and good faith in obtaining the instruments under attack are not proved. The trial court properly decreed the cancellation of which Lund complains.

The trial court did not cancel a note for $850, one for $600, one for $50 and one for $1179.62 but held plaintiff's ward liable upon them and directed plaintiffs to pay them.

The $850 is duplicated in the note for $1179.62.

Lund claims that the $600 came from an estate. He testified:

"I received some fees out of it. Part of the money went through the bank * * * Q. Then you got some money from one uncle's estate and sent it to a cousin and that indirectly affected the Reeder transaction? A. Because the original $600—Mr. Johnson: What $600? A. I may be wrong on this, let's see that statement again, as I recall it, it was returning my cousin a portion of the money that was in that $600 note."

This note is dated April 7, 1928, endorsed to L. T. Savin, or order, but the deposit from which he claims to have got the money was $737.92 made on May 16, 1928, a month later than the note, and Lund testifies that he gave Reeder for this note $600 in currency. The $600 note must be cancelled.

The $50 note is dated August 18, 1928. Lund's explanation of it is that it was given in renewal of the balance of a note for $100 for which he gave Reeder a check July 11, 1927, and on which Reeder paid $50 and interest. Lund's testimony in support of this note is unsatisfactory, without corroboration and is insufficient to remove the presumption.

The note for $1179.62 was one of the three secured by the mortgage dated October 23, 1928, for the aggregate amount of $6679.62. Lund explains that Reeder requested him to negotiate a mortgage loan for the purpose of taking up an existing mortgage to a bank for $4219.48, and interest, and that he (Lund) demanded that the mortgage be made to secure notes of Reeder held by Lund. Lund says that he made up three notes aggregating $6679.62 computed as follows: Amount owing the bank, including interest, $4355.58; two notes held by Lund, one for $1000 and one for $289; note of Arthur C. Reeder, the ward's son, for a loan to be made to Arthur $850, commission on the loan to be negotiated $66. The three notes into which he divided

this sum were for $3000, $2500 and $1179.62 as specified in the mortgage. Lund secured for Reeder a real estate loan for $5400 for which the loan company after paying for release of the existing mortgage $4398.61, deducting interest $9, remitted to Lund check payable to Reeder for the balance—$992.39. This check was endorsed by Reeder to Lund and used by him. Thus the $5400 is to be deducted from the three notes aggregating $6679.62. Lund made endorsements on the $3000 note and the $2500 but none on the $1179.62. To support the notes for $6679.62 Lund claims to have held a note given to him by Reeder in March, 1927, for $1000, which with interest $41.70 he cancelled and gave back to Reeder as a part of the $6679.62. Arthur Reeder was present during the transactions concerning the three notes and mortgage aggregating $6679.62, which as has been said, was furnished him not in cash (except $50) but small checks. Arthur Reeder testifies that he owed the City National Bank; that his father was on the note and it was necessary to pay the bank off and take a new loan, which they did; that he was particularly interested in getting the loan for $850; that Lund claimed his father owed him $1000 for services and that was to be included in the loan his father was obtaining to pay the City National; that he never knew of his father's getting currency from Lund at any time and Lund did not claim to have loaned his father any currency previously; was never present at any other transaction between Lund and his father: that on the date his father signed the notes and mortgage it was explained to him several times and his father appeared to understand what he was signing and Arthur understood it; that he thinks that Lund stated that he had some other notes of his father's; that Lund did not say what kind of notes they were, nor the amount, nor how his father came to give them or what he gave them for; that there was no talk about mortgages or notes running to Lund himself and he (Arthur) did not know that Lund had drawn the papers to himself. It is evident that Arthur's interest was in his own needs, that he knew nothing about his father's business relations with Lund or alleged indebtedness to Lund (except on the notes signed for Arthur), relied upon Lund and that from Arthur's presence the father got no independent advice or the benefit of any independent knowledge or investigation.

Lund testifies that the $1000 note was given originally for currency and was renewed while Arthur testifies that Lund said that the note was given for fees. Lund's claim to this note, amounting to $1041.70, is unsustained by the proof and this sum must also be deducted from the $6679.62. The $289 note was for the balance of a loan originally made to Arthur, which is not contested as is also the $850 note. Plaintiffs do not claim forfeiture of right to commission for malfeasance. Lund should be allowed the commission of $66.

In 1927 Reeder turned over to Lund on different dates four Government bonds for $1000 each. Lund testified that October 26, 1928, he held in his possession four notes for $1000 each, dated respectively July 9, 1927, July 29, 1927, September 12, 1927, and April 19, 1928, each describing as collateral to it a Liberty Bond.

"Q. And you had not given him any credit for any collateral sold, had you, on those notes? A. No, sir. * * * Q. He had receipts for bonds that you had sold and got the money on and had not (been) given any credit for, that is true, isn't it? A. Yes, sir. Q. Now the way these transactions, each one of them, represented by Exhibits 9, 10, 11 and 12, occurred was this: On the same day that Mr. Reeder would sign one of these collateral notes for you, and give you his bond, and sign over the registered bond to you, you would take that bond to one of the banks here and put it up as collateral to your note to the bank? A. Sometimes. Q. You did that in every one of these cases, didn't you? A. Perhaps I did."

The evidence shows the sources of the advancements to Reeder on these collateral notes to the amount of $2531.08. A balance of $1000 on one bond and $468.92 on another is not shown to have been paid except by Lund's unsupported testimony that he paid these sums to Reeder in cash. Lund admittedly got these four bonds for $1000 each. Nevertheless, he obtained from Reeder Reeder's four notes for $1000 each. In this case, as in the others, he has the burden of proof. In his fiduciary dealings it was his duty to keep accounts. He did not do so. His evidence as to the $1000 and $468.92, as in other respects, is more consistent with an intention to defraud than with good faith. He has not successfully met the burden of proof. Lund is en-

titled as against the amount of the bonds, $4000 and the $992.39 received from the loan, credit for the $2531.08 and for the three notes for $850, $289, $75 and interest. For the balance of the $4000 and the $992.39, with proper interest allowances, the plaintiffs are entitled to judgment against Lund.

On Lund's appeal the judgment is *affirmed*.

On plaintiffs' appeal *reversed*.

EVANS, STEVENS, ALBERT, KINDIG, WAGNER, and GRIMM, JJ., concur.