LESTER A. YORK, *Plaintiff and Appellant,*

vs.

JOHN P. JAMES, *Defendant and Respondent.*

(No. 2334; January 15th, 1946; 165 Pac. 2d 109)

188

For the plaintiff and appellant the cause was submitted upon the brief and also oral argument of William G. Watt of Lusk, Wyoming, and Arthur H. Laws of Denver, Colorado.

For the defendant and respondent the cause was submitted upon the brief of Thomas O. Miller of Lusk, Wyoming, and oral argument of John P. James, pro se of Denver, Colorado.

OPINION

RINER, Justice.

This is the second appearance in this court of this case. The parties may be conveniently mentioned herein as "plaintiff" or "defendant" or by their respective surnames. As indicated in the previous opinion (York vs. James, 60 Wyo. 222, 148 Pac. 2nd 596), the action was one to quiet title brought by York against James relative to certain lands situate in Niobrara County, Wyoming, and the judgment of the district court reviewed in that opinion had been rendered in favor of the plaintiff. In the record now before us it appears that James, the defendant, was successful and from the judgment in his favor York is now the appellant.

By the record first made in this case it appeared that the plaintiff did not plead or prove that he had given a valuable consideration for the deed to the property involved in the lawsuit and upon which he relied to establish his title thereto but simply based his right to relief upon the mere recital therein of the receipt by the grantor of "One Dollar and other good and valuable considerations". Under the provisions of § 97-135, W. R. S. 1931, we held that this proof was insufficient under the situation then presented by the record made on the first trial and discussed in the opinion aforesaid. The judgment was accordingly reversed and a new trial ordered. We did not undertake to foreclose all other questions which might arise in the case upon retrial.

The pleadings of the parties as now appearing in the present record are the same in substance as those described in our former opinion except that allegations of want of notice of the earlier deed to James and that for a valuable consideration York became the owner of the property in question now are set forth in plaintiff's

behalf. It will not, therefore, be necessary herein to re-state the substance of the pleadings.

Additional circumstances and contentions of the parties, however, do appear before us now and for that reason it is deemed appropriate to state anew what facts are required to be considered in properly dispos-ing of the case.

The 320 acres of homesteaded real estate which is the subject of this controversy is located in Niobrara Coun-ty, Wyoming, as above stated. February 18, 1918, a United States Patent for this land was issued to one James W. Shaner which was duly recorded in said county on the 25th of March, following. Shaner and his wife, Lena, resided upon and farmed at least a portion of this property from about 1914 or 1915, until the year 1928 when they removed to Denver, Colorado. In March, 1918, the Shaners mortgaged this land to Pet-ters and Company of Minneapolis, Minnesota, for $1,000.00. This mortgage was subsequently released. Thereafter and on November 1, 1923, the land was again mortgaged by James Shaner and wife to Mary Payette for $700.00. This mortgage was also subse-quently released. A warranty deed from J. W. Shaner appears to transfer title to this property to Lena Shan-er, his wife, the instrument being dated August 8, 1924, and recorded July 18, 1927.

Before her marriage Lena Shaner lived with her sis-ter, Margretha York, for many years. Another sister, Mary Payette, has already been mentioned above. Mar-gretha York was the mother of the plaintiff herein, Lester A. York, and Lena Shaner was, of course, his aunt. It seems there was a third married sister, a Mrs. Lizzie Klemen, who lived in Nebraska.

It appears that during the period of residence of the Shaners upon the land in controversy, as stated above,

the plaintiff aided them in many substantial ways. He sent them several hundred dollars to purchase the necessary building material and to pay for the labor of having a home built on the place. He also sent them money to pay the taxes on this property and for food, clothing, as well as for threshing and other expenses they had need of during those years they lived in Niobrara County. For eight or nine years also he sent his aunt railroad fare to come to Denver and return to her home in Wyoming so that she could spend the colder winter months in that city. He also supplied her with things she needed while in Denver. He does not seem to have kept an exact or any particular account of the various sums of money he expended for the Shaners or have demanded of them that they repay the money he thus advanced for their benefit. At any rate, the sums thus turned over to them were never repaid to him by his aunt or her husband.

When the Shaners came to live in Denver, York built an addition to his mother's home in that city to take care of them until they could arrange to move to some other place and they lived there some considerable time.

The defendant, James, was an attorney at law in Denver and prior to July 14th, or 15th, 1940, when he severed his connection therewith, he was employed as such in the State Welfare Department of the State of Colorado. He handled old age pension cases under the laws of that state and in the course of his duties regarding matters of that kind he met Mr. and Mrs. Shaner. In either the year 1936 or 1937, James learned that Lena Shaner owned the land, aforesaid, the fact coming to his knowledge because, as he testified, "Anybody that had land on which they were not living had to give the Welfare Bureau a lien on the land, and she came into the office to execute the lien on the land." So far as appears by the present record no lien was ever imposed

upon the land aforesaid. One of the attorneys representing the plaintiff and who also resided in Denver testified that he had a conversation with James prior to the institution of the instant litigation in which James said that the Shaners had had their old age pension discontinued as a result of the appraisal that was put upon the Niobrara County land, which appraisal was in an amount in excess of the amount permitted an old age pensioner in Colorado, and that he, James, arranged to have the land re-appraised showing a figure that brought it within the limit an old age pensioner was permitted to own. In rebuttal of this testimony James, himself, testified that he told York's attorney, "that these Wyoming lands were appraised just the way that we appraised a thousand other old age pensioners who were similarly situated. I handled the routine procedure, and that was all that I had to do with it. I had nothing to do with fixing the values for any of them", and that he (James) did not tell him that he had had this land re-appraised.

On the 10th day of August, 1940, Lena Shaner of the City and County of Denver, as grantor, executed a warranty deed to the lands aforesaid to John P. James, also of said city and county, as grantee. This deed was witnessed by the grantee and Marion P. James. The consideration of this deed was recited therein as "Ten Dollars and other consideration". It was not acknowledged or delivered to the grantee, as he testified, until more than a month later, to-wit, on September 18, 1940. This deed was not placed on record in Niobrara County until the following year, as hereinafter detailed.

One month later and on October 18, 1940, Lena Shaner and James W. Shaner, her husband, as lessors, demised to Continental Oil Company, as lessee, the lands in question for the purpose of giving the lessee the privilege of drilling water wells, laying pipe lines,

impounding surface water, etc. The term of the lease was for one year and the rental the sum of $160.00, with additional payments of $25.00 per year for each water well drilled on the premises. These $25.00 payments on account of the lease were provided to be paid to the lessors in person "or by mailing such payments to Lessor in care of John P. James 1065 South Josephine St. ,Denver, Colo. or by depositing the same to the credit of Lessor in the Colorado State Bank, of Denver, Colo. in the account of John P. James." This instrument was witnessed by John P. James. Concerning it James testified:

"Q. Lena Shaner and James W. Shaner appear in that lease as the lessors?

A. That's right.

Q. And the owners of the property?

A. That's right.

Q. You witnessed that lease, did you not?

A. I did.

Q. And you know about its execution?

A. Yes, sir.

Q. And were present when it was executed?

A. Yes, sir.

Q. And that was subsequent to the execution of the acknowledgment of the deed that you introduced in evidence here?

A. Yes, sir, it was.

Q. As being a deed from Lena Shaner to yourself, and another deed from James W. Shaner to yourself?

A. That's right.

Q. And all these instruments pertain and affect the same land?

A. That's right."

No reason appears why James either did not join in the lease or be named therein as sole lessor.

In December, 1940, several weeks before the 15th day of January, 1941, York found that his aunt and her husband were residing in a so-called Convalescent Home under bad living conditions and he summoned an ambulance at his own expense and had them moved to another place of residence at 7th and Kalamath streets in Denver. There James W. Shaner died on January 8, 1941.

January 16, 1941, in Denver, Lena Shaner executed and delivered to her nephew, York, a warranty deed to the lands in controversy. This deed recites as its consideration "One Dollar and other good and valuable considerations", as noted above. It was signed by the grantor by her mark and witnessed by the notary who took her acknowledgment and also by Ethel York, the wife of the grantee. This acknowledgment is in the usual form and appears to comply with the requirements of Wyoming law in such matters, § 97-125 W. R. S. 1931. This instrument was placed of record in Niobrara County on January 23, 1941.

March 5, 1941, Lena Shaner died. March 14, 1941, the deed, above described, from Lena Shaner to James, was placed of record in Niobrara County. The present action to quiet title was commenced by York on September 18, 1942. Other additional facts and circumstances shown by the record, especially those in connection with the execution of the two conveyances, the one from Lena Shaner to James and that from her to York, will be subsequently mentioned in connection with the contentions of the parties herein.

We, accordingly, have before us now a record disclosing that both parties here are claiming title through a common grantor. Defendant appears to

urge that plaintiff was required to prove a title extending back to the government grant of these lands and that he cannot take advantage of the evidence introduced by the defendant showing that their common grantor's title came through such a grant. There are several answers which may be made to this contention the altogether conclusive one being that parties in an action to quiet title where they each assert opposing claims of title to the property involved need not show title beyond the common grantor. 51 C. J. 174, § 76, and extended list of cases cited in Note "3", to which many more might easily be added.

In Davis, et al., vs. Minnesota Baptist Convention, 45 Wyo. 148, 16 Pac. 2nd 48, we pointed out that, in a suit to quiet title, *ordinarily* the plaintiff "must recover on the strength of his own title and not on the weakness of his adversary's."

However, as stated in 51 C. J. 174, § 76:

"The rule that plaintiff must recover on the strength of his own title, is inapplicable where the parties trace their respective titles to a common source. In such case plaintiff need not show a title good as against the whole world, but only as against defendant, and the one who has the superior title or equity must prevail."

"The rule is well established," remarks the court in Harrell vs. Nichols, 86 Okl. 115, 206 Pac. 817, "that in a suit to quiet title the plaintiff must recover on the strength of his own title rather than the weakness of his adversary's; but there is a well-recognized exception to this rule, and that is, where both parties trace their title to a common source, the one must prevail who has the superior equity."

In Williams vs. Sands, 251 Mo. 147, 158 S. W. 47, concerning the same subject the court tersely said, "Both plaintiff and defendants claim, as the record shows, under a common source of title; therefore the

only question is who has the better title from that common source."

So in Eickhoff vs. Scott, 137 Ark. 170, 208 S. W. 421, it is said:

"It is true, in an adversary suit, that the plaintiff must recover on the strength of his own title, and not the weakness of the defendant's title. Knauff v. National Cooperage & Woodenware Co., 99 Ark. 137, 137 S. W. 823, and cases cited therein. This rule is applicable where the parties claim title from independent sources, and has no application in cases where the parties trace their respective titles to a common source. Where parties trace their title to a common source, the one must prevail who has the superior equity."

See also Cohn vs. Klein, 209 Cal. 421, 287 Pac. 459.

Later cases so rule, for in Griggs vs. Griggs, 199 S. C. 295, 19 S. E. 2nd, 477, we find this language used:

"There is another principle of law to which this Court has given sanction as far back as the case of Brown v.Moore, 26 S. C. 160, 164, 2 S. E. 9, 11, wherein it is stated: '* * * Ordinarily in a land case, the plaintiff must make out a complete title, and must recover upon the strength of that title, and not upon the weakness of the title of his adversary, and there is no onus whatever upon the defendant. He may fold his arms, and await the complete title of the plaintiff, in default of which his possession cannot be disturbed. Where, however, both parties claim from a common source, the case will turn in favor of the one having the superior title. * * *'."

The brief statement of the Supreme Court of Georgia, in Holliday vs. Guill, 196 Ga. 723, 27 S. E. 2nd, 398, is in point where this was said:

"Since the plaintiff and Mrs. Holliday both claimed under Mrs. Rosa S. Orr, as common grantor, the test was as to which of them held the better title from her."

In addition to the principle announced by the authorities just reviewed it will be recalled that we have in

this case a cross-action by the defendant, James, against the plaintiff, York. In such a case the court, in Savage Bros. Timber Co. vs. Cozad, 192 N. C. 40, 133 S. E. 173, held that the defendants were properly required to assume the burden of proof on their cross-action in a suit to quiet title in which they claimed ownership of the land involved since as to the cross-action they were plaintiffs. Where in an action to quiet title the defendant, by cross-complaint, set up title in himself which was denied by the plaintiff in the latter's replication, before the defendant was entitled to judgment in his favor, it was held in House vs. Grable, 25 Colo. App. 405, 138 Pac. 1012, that the defendant had the burden of proving title in himself. In Durkin vs. Ward, 66 Oreg. 335, 133 Pac. 345, the court similarily ruled saying:

"In an action to quiet title where each party claims to be the owner of the property, the burden is on each to make good by evidence his affirmative averments touching his own title to it. 12 Enc. Evid. 608."

See also Fitzgerald, Trustee, vs. Goff, 99 Ind. 28. It is elementary, of course, as indicated by the text, 51 C. J. 249, § 227, that "where defendant substantially asserts and relies upon a fact as an affirmative issue he must establish the same" in a suit to quiet title. Also, as will presently be shown the burden rests heavily upon defendant to establish that he has a good title to the property in question in consequence of certain facts and circumstances surrounding the execution and delivery of the deed from Lena Shaner to him.

We proceed, therefore, first to consider the title of plaintiff as shown by the present record and the objections thereto advanced by the defendant. It is urged on the latter's behalf that the plaintiff is not a purchaser in good faith and for a valuable consideration. In that connection our attention is again called to § 97-135 W. R. S. 1931, which reads:

"Every conveyance of real estate within this state, hereafter made, which shall not be recorded as required by law, shall be void, as against any subsequent purchaser or purchasers in good faith and for a valuable consideration of the same real estate or any portion thereof, whose conveyance shall be first duly recorded,"

and § 97-102, W. R. S. 1931, which further provides that:

"The term 'purchaser,' as used in this article shall be construed to embrace every person to whom any estate or interest in real estate shall be conveyed for a valuable consideration, and also every assignee of a mortgage or lease, or other conditional estate."

So far as the element of good faith on the part of York is concerned relative to the deed from Mrs. Shaner to him it is, we think, true of this record as it was of the former one that the fact is established that York had no notice of the prior issuance of the deed by Lena Shaner to James. A careful examination of the evidence in the case has led us to that conclusion. York, testified, without contradiction, that he had no notice of the James deed until after the death of Lena Shaner. It is suggested by the defendant that because the lease payments provided for in the recorded lease of the Shaners to the Continental Oil Co., for the water wells drilled on the premises, should be made to them personally by the lessee or in care of James or deposited to their credit in his account, "was enough to put him (York) on notice". We do not think so. The fact that James acted merely as a witness on that instrument and not as a party in any way thereto would lead any reasonable man to conclude that James had no connection, whatsoever, with the title although he held at that time the unrecorded deed under which he now claims ownership.

Relative to the contention of the plaintiff that he was a purchaser for a valuable consideration we have more

difficulty. It was asserted for plaintiff that he gave up antecedent debts for the deed to him from Mrs. Shaner, given on January 16, 1941. It seems to be unquestioned that York, as already stated, turned over to the Shaners and to his aunt, Lena Shaner, considerable sums of money for matters necessary to their welfare and that the last of these amounts was paid several weeks before the deed last mentioned was executed and at the time when he called an ambulance for their benefit in December, 1940. Mrs. Margretha York, plaintiff's mother, who was present when this deed was executed, testified that plaintiff did not, at the time the deed was signed, pay her sister any money; that her sister wanted York to have that property because, she said, "he was always good to me and to Mr. Shaner too"; and that when Mrs. Shaner deeded this land to York she was in reality making him a gift of it for what he had done in the past. Ethel York, plaintiff's wife, who also was present at the time the instrument was signed testified that Mrs. Shaner stated she wanted her nephew to have this property "because he had always done so many things for her in her lifetime and he always helped her out."

Nothing seems to have been said by Mrs. Shaner, her husband, or York at any time, that the latter expected repayment of these funds advanced by him to them or to her; no time was set for payment; there was no provision for payment of interest; no request appears to have been made at any time by York of his aunt that she repay the money with which he supplied her. It would rather seem that these were gifts by him to her and, while there was perhaps a moral obligation to return the money thus advanced, it is difficult to see that they were really antecedent debts owed to him from her which were cancelled by the execution and delivery of her deed of January 16, 1941. Without in terms so deciding, we shall assume, therefore, that this

deed from his aunt to York was a voluntary one and merely represented a gift from her to him. Nevertheless, it is, of course, true that if the prior deed given James by Mrs. Shaner should be for any reason invalid the title to the property should be quieted in York.

We now turn to an examination of James' purported title which, as we have seen, rests solely on the deed executed by Lena Shaner on August 10, 1940, and acknowledged and delivered September 18, 1940. In passing we may note that the acknowledgment attached to this deed would appear to be essentially defective as not substantially complying with the requirements of § 97-125, W. R. S. 1931, and, hence, not entitled to record. In Vorenberg vs. Bosserman, 17 N. M. 433, 130 Pac. 438, the acknowledgment attached to the instrument there in question, a mortgage, was in this form: "State of Colorado, County of Denver—ss: This mortgage was acknowledged before me by O. G. Keysor this 11th day of April, A. D. 1911. Bernard C. Bub, Notary Public." The acknowledgment attached to the Lena Shaner deed to James is: "State of Colorado, City & County of Denver—ss. The foregoing instrument was acknowledged before me this 18th day of September, A. D. 1940, by Lena Shaner. My commission expires Mch. 8-1941. Witness my hand and official seal. William B. Slife, Notary Public." The similarity of the two forms is apparent. § 3945, Comp. Laws New Mexico, 1897, is identical in terms with that part of our § 97-125, supra, designated subdivision "1". The pertinant part of the section just mentioned reads: "Certificates of acknowledgment substantially in the following form shall be sufficient: (1. In the case of natural persons acting in their own right:) On this ———day of———19——, before me personally appeared A. B. (or A. B. and C. D.), to me known to be the person (or, persons) described in and who executed the foregoing instrument, and acknowledged that he (or, she or they)

executed the same as his (or her or their) free act and deed." Concerning this situation the New Mexico court said:

"It can hardly be contended, it seems to us, that the acknowledgment of the mortgage in question is a substantial compliance with the requirements of either section 3945 or 3949. * * * But in this case there is no recital that the mortgagor acknowledged that he executed the instrument, or that the person who appeared before the notary was the person described in, and who executed, the instrument. The recital is simply that the instrument was acknowledged by O. G. Keysor. This will not do. This is not a substantial compliance with the statute."

See 1 C. J. 772, § 52, 851 § 194.

Passing by the question whether section 97-135, W. R. S. 1931, supra, was intended to apply to a deed defectively acknowledged and not entitled to record, it may be observed that the allegations of the defendant's cross-petition claiming ownership by defendant of the lands here involved and that the claim of plaintiff thereto is without any right whatever and that the plaintiff had no estate, right, title, or interest therein were denied by plaintiff's reply to that pleading. As before stated it is incumbent upon defendant to establish these allegations by his proofs.

James, himself, testified on cross-examination that the consideration for the deed from Mrs. Shaner to him consisted of some money and some legal services; that this money, which was nine dollars and some cents was paid to her in cash at the time her deed was delivered to him, viz., September 18, 1940; that this money was not something that he had paid out for her but was "a reimbursement for the taxes on it (the land?) that they paid that year"; that the legal services rendered Mrs. Shaner were three or four letters written in regard to a grazing lease that one Mosier had on the property

in question; that the notary whom James brought to Lena Shaner for the purpose and who took the acknowledgment of the deed of Mrs. Shaner also took her acknowledgment of this lease; that James charged Mrs. Shaner for these services the sum of $15.00; that this was all the consideration for the deed; that these legal services "were concluded on the 18th day of September, 1940", having been commenced in "May or June or possibly April, 1940".

James also testified that at the time the deed was delivered that the Shaners "were two old people, and Jim had had a stroke and she was partly paralyzed, and they had no one who was looking after them, and I told them that I would see that they were taken care of"; also that he told them that "At the time that the deeds were given and before the deeds were given and after the deeds were given." In this connection he stated further, "I didn't say that I would take care of them. I said I would look after them and see that they were taken care of. They had their pensions and they didn't need anyone to take care of them except if they needed a doctor or needed something that they couldn't get, I would see that they got it."

There was also testimony of one of the Denver attorneys of York that previous to the commencement of this litigation James told him "that the deed which he had from Mrs. Shaner was given to him to satisfy her apprehensions about what the situation might be with respect to her husband's welfare in the event she predeceased him. He said she had told him that she felt she might die before her husband, and in that event she wanted James to see that Mr. Shaner got the full benefit of that property without cost or expense and that it was devoted to his needs, and that it was for that reason that the deed was executed by Mrs. Shaner to him." Concerning this testimony, on rebuttal James

answered the following questions propounded to him by his counsel thus:

"Q. What he said about you taking this deed just to calm Mrs. Shaner's fear—was there anything to that?

A. Absolutely not.

Q. Or that she wanted Mr. Shaner to get the full benefit of it because she was afraid she would predecease him—was there any thing to that?

A. No, sir."

No other explanation as to why the deed from Mrs. Shaner to James was given appears in the record.

It appears, then, that at the time this deed to James was delivered he was acting as attorney for Lena Shaner and we must, accordingly, consider the consequences of such a confidential relation in connection with that fact. We are referred, by plaintiff's brief, to 7 C. J. S. 969, § 128, where we find it said:

"The general rule that all transactions and dealings between attorney and client are subject to close scrutiny and presumptively fraudulent or the result of undue influence applies with full force, however, to any purchase or acquisition by an attorney of his client's property. Hence, a transfer, conveyance, or assignment of property by a client to an attorney is subject to avoidance and being set aside as constructively fraudulent or the result of undue influence, except to the extent that it operates as a payment of reasonable and proper fees, if the attorney fails to discharge his burden by showing that the transaction was fair, equitable, and honest, for an adequate consideration, and that the client had the benefit of impartial advice or was fully informed of the nature and effect of his act so that he was in the same position as if he had dealt with a stranger, * * *."

Reference is also made to 5 Am. Jur. 289, § 50, where this language is used:

"When a transaction between an attorney and his client is attacked, the burden is cast upon the attorney to prove that it was not influenced by the relationship. He must show that it was made in the best of faith and without disadvantage to the client, that it was fair and equitable, and that the client was fully informed of his rights and interests in the subject-matter of the transaction, of the nature and effect of the transaction itself, and was so placed as to be able to deal with the attorney at arm's length. This is especially true in the case of an assignment or conveyance from the client to the attorney, or where the attorney takes a mortgage from the client."

Well illustrating the strictness with which the English courts view a conveyance from his client to an attorney is the case of Wright vs. Carter, 1 Ch. Div. (1903) 27, 60, which disclosed a situation where the plaintiff executed a voluntary deed giving part of his property in trust after his death to his two children and to his solicitor, on the consideration by them to pay him a certain annuity during his life. The consideration to be paid was inadequate to the amount received. On the suggestion of this solicitor, the plaintiff submitted the trust deed to a separate solicitor who was not fully informed of all the facts. The court held the deed void. Sterling, L. J., stated that the rules of the court require three things to be proven in a transaction of sale in which the solicitor is a purchaser, vis., "first, the client must be fully informed; secondly, he must have competent independent advice; and, thirdly, the price which is given must be a fair one. The onus of proving all this lies on the solicitor." The Lord Justice grounded his decision upon the simple fact that the defending solicitor had failed to prove that fair value had been given for the deed although also the Justice was not satisfied that the other two requirements he mentioned had been established.

The American courts have not lagged very far behind these views, as the excerpts from the following cases will demonstrate:

In Moore vs. Rochester Weaver Mining Co., 42 Nev. 164, 174 Pac. 1017, this was said:

"No principle has been so rigidly adhered to by the courts of this country and England than that where an attorney deals with his client for the former's benefit, the transaction is not only regarded with suspicion and closely scrutinized, but it is presumptively invalid on the ground of constructive fraud, and that this presumption can be overcome only by the clearest and most satisfactory evidence. The rule is founded in public policy, and operates independently of any ingredient of actual fraud, being intended as a protection to the client against the strong influence to which the confidential relation naturally gives rise. Thomas v. Turner's Adm'r, 87 Va. 1, 12 S. E. 149, 668; Elmore v. Johnson, 143 Ill. 513, 32 N. E. 413, 21 L. R. A. 366, 36 Am. St. Rep. 401."

The Supreme Court of Wisconsin, in Armstrong vs. Morrow, 166 Wis. 1, 163 N. W. 179, said, with reference to a mortgage assigned by a client to his attorney, that:

"It is incumbent upon the attorney in a case like the one at bar to show affirmatively either that he paid an adequate consideration for the property, or that a gratuity was intended and that no advantage was taken of the confidential relations existing between the attorney and his client to obtain it." (Citing cases.) A judgment of the trial court setting aside the assignment was affirmed.

In Warner vs. Flack, 278 Ill. 303, 116 N. E. 197, the court states in the opinion filed:

"The demurrer admits that during the existence of the relation of attorney and client the defendants purchased their client's property. In such case it is not necessary to show fraud or imposition on the client, but the burden is thrown upon the attorney of proving the

perfect fairness, adequacy and equity of the transaction, and upon his failure to make such proof a court of equity will treat the case as one of constructive fraud." (Citing cases.)

See also Reeder vs. Lund, 213 Iowa 300, 236 N. W. 40; Israel vs. Sommer, 292 Mass. 113, 197 N. E. 442.

Although the present litigation was not instituted by Mrs. Shaner to show that the deed to James was invalid on the ground of the confidential relations between them, it seems clear that her grantee, York, may, himself, take advantage of the situation of the parties to that deed at the time it was given. The note in 110 A. L. R. 856, upon the authority of English and American decisions states that:

"According to the more modern view, and the one adopted by a majority of the cases, one to whom real estate has, in form, been conveyed, by an instrument intended to enable the grantee to succeed to the title, may maintain a suit to obtain a rescission of the grantor's prior voidable conveyance to a third party, notwithstanding that the latter entered into possession. Although the ground upon which such a suit is ordinarily prosecuted is that of fraud practiced on the grantor, there seems to be no feature of the law of assignments, as now applied by a majority of the courts, which precludes the second grantee from maintaining the action upon any ground which is sufficient to render the prior conveyance voidable at the instance of the grantor himself."

The case of Dickinson vs. Burrell, (1886) L. R., 1 Eq. 337, is listed as the leading English case on the point. It was there held that the right to institute a suit to set aside a conveyance on equitable grounds passed by the grantor's subsequent voluntary conveyance of the same property, and the grantee under the subsequent conveyance might institute such suit independent of the grantor. The Master of the Rolls, Lord Romilly, said, inter alia:

"In truth, any interest which, but for the previous deed, would have been sufficient to enable a person interested to ask this Court to secure the property for the benefit of the persons interested therein, would, in my opinion, enable that person to ask this Court to set aside the deed obtained by fraud, which, if valid, would have prejudiced or destroyed his interest in the property purported to be conveyed to him. I think that the distinction between the conveyance of the property itself and the conveyance of a mere right to sue, or what in substance is a right to sue, is taken by Lord Abinger in the case of Prosser v. Edmonds, I Y. & C. Ex. 481. The distinction is also taken in Cockell v. Taylor, 15 Beav. 103, and in Anderson v. Radcliffe, E. B. & E. 806 (E. C. L. R. vol. 96), and has been adopted and approved in many other cases; and it is, I think, founded in reason and good sense. I am, therefore, of opinion that if the present Plaintiffs had given valuable consideration for the execution of the indenture of April, 1864, they would have been entitled to maintain this suit.

"I have next to consider whether the fact of the conveyance being voluntary alters or affects this right. I am of opinion that it does not. There are, no doubt, various circumstances which may be connected with a voluntary deed which will induce this Court either to set the deed aside, or to refuse to execute the trusts contained in it. There are also statutory enactments which may defeat a voluntary deed, which would be otherwise valid; but assuming a voluntary deed to be complete, *bona fide*, and valid, and to be unaffected by any statutory disability, I know of no distinction between such a deed and one executed for valuable consideration. The estates and limitations created in such a deed have the same operation and effect as in a deed executed for value, and must be construed in the same manner, and it carries with it all the same incidents and rights attached to the property conveyed as are carried by a deed executed for value, and the grantee, in this respect, stands exactly in the same situation as if he had paid value for the property conveyed."

The decision last reviewed was approved and applied by the Supreme Court of the United States in the case

of Traer vs. Clews, 115 U. S. 528, 6 Sup. Ct. 155, 29 L. Ed. 467. See also Rock Springs Coal & Mining Co. vs. Black Diamond Coal Co., 39 Wyo. 379, 408, 272 Pac. 12, 20; May vs. Penton, 45 Wyo. 82, 16 Pac. 2nd. 35; Paine vs. Baker, 15 R. I. 100, 23 Atl. 141.

Applying these authorities to the evidence before us as reviewed above it is evident that the purported deed of Lena Shaner to James cannot stand. This instrument was given to him by an aged woman nearly eighty years old who, according to James' own testimony, was at that time "partly paralyzed", and her husband "had had a stroke". There is no proof whatsoever that these old folks were fully informed of the effect of the deed that Mrs. Shaner executed to James. Indeed, it appears he gives no explanation of why the deed was given as he as a witness on rebuttal stated that there was nothing to the testimony of plaintiff's counsel that she wanted Mr. Shaner to get the full benefit of the property without expense to him in case she should predecease him. There is no pretense that James suggested that these people have independent advice relative to the transaction before the instrument was signed. As a member of the bar he should have known and properly acted upon the legal requirements flowing from the confidential relation existing between him and them. It is to be noted also that there is no explanation at all given by James why the deed he received from Mrs. Shaner was withheld from record for practically six months after the delivery thereof and then was sent to the recorder's office only after both Mr. and Mrs. Shaner had died. Ordinarily such an instrument is recorded promptly. No one knows better than one learned in the law the necessity for this.

Relative to the asserted consideration of this deed to James he testifies he paid Mrs. Shaner nine dollars

and some cents in September, 1940, when the deed was delivered; that this payment was not something he had paid out for her but was a "repayment for taxes on it that they paid that year", as quoted above. Why was this "repayment" necessary? The record does not tell us. § 115-305, W. R. S. 1931, provides:

"As between the grantor and grantee of any property, real, personal or mixed, where there is no express agreement in writing as to which shall pay the taxes that may be assessed thereon, if such property is conveyed on or after the first day of January, then the grantor shall pay the taxes thereon for that year."

The remaining portion of the claimed consideration for the deed was for legal services which were charged to Mrs. Shaner in the sum of $15.00. This charge was made for writing three or four letters concerning a grazing lease on the property in question and taking a notary to Mrs. Shaner to take her acknowledgment both of the deed to James and of the lease about which the letters were written as detailed above. There is no proof that these services were reasonably worth the sum of $15.00. Assuming that they were and that the nine dollars and some cents was properly paid on account of the consideration for the deed and that Mrs. Shaner was so informed, was twenty-four dollars and some cents a fair and adequate consideration for the sale of 320 acres of real estate upon which, some years before, a loan company had made a loan of $1,000.00; and, after that had been repaid, a relative of Mrs. Shaner had loaned $700.00 thereon; on which crops had been grown and threshed; and just a month after the delivery of this deed to James the Continental Oil Co. agreed to lease the property for $160.00 yearly rental and $25.00 additional yearly for each water well, drilled thereon? No affirmative evidence appears in this record on this point, and we are not inclined, without clear and satisfactory proof to that effect, to think

that such claimed consideration was either fair or adequate.

Again, we are unable to understand why James merely acted as witness on the Continental Oil Co. lease after, as he now asserts, he was at the time the lease was given, the actual owner of the demised property. James was asked about this matter on the witness stand, as we have seen, but no explanation was, at that time or at any time, given as to why he did not appear as a party to the lease and not the Shaners. It would seem that these old people then thought they were the owners and had the right to lease the property and the rental money, so far as appears, was paid to them and not to James.

Upon the whole record, after careful consideration, we are convinced that the defendant has not met the burden resting upon him to show that the deed of August 10, 1940, was a valid instrument under the circumstances in which it was given. We are, therefore, obliged to reverse the judgment of the trial court with instructions to enter a judgment quieting title to the land in controversy in the plaintiff. If it should appear that there is any amount of money paid as consideration for this deed by James which should legally be returned to the defendant, the district court is authorized to so order in its final judgment directed as above indicated.

*Reversed with instructions.*

BLUME, C. J., and KIMBALL, J., concur.