HAGEMAN AND POND, INC., a corporation, HAGE-
MAN PROPERTIES, INC., a corporation, HOWARD
C. HAGEMAN and WILLIAM M. HANLON,

*Plaintiffs in Error,*

vs.

BILL CLARK,

*Defendant in Error.*

(No. 2496; December 11, 1951; 238 Pac. (2d) 919)

For the plaintiffs in error the cause was submitted upon the brief and also oral argument by C. A. Zaring of Basin, Wyoming.

For the defendant in error the cause was submitted upon the brief and also oral argument by W. J. Wehrli of Casper, Wyoming.

## OPINION

BLUME, Justice.

This is an action brought by the plaintiffs against the defendant Bill Clark to recover damages in the sum of FIFTY THOUSAND DOLLARS ($50,000.00) from the defendant on account of the failure of defendant to drill an oil well. A demurrer was filed to the petition on the ground that it fails to state facts sufficient to constitute a cause of action. The trial court sustained the demurrer and plaintiffs not pleading further, judgment was entered in favor of the defendant. From that judgment the plaintiffs have brought this case to this court by petition in error. Parties will hereafter be referred to in the case below, namely as plaintiffs and defendant.

The petition in this case, aside from the caption and signature, is as follows: "The plaintiffs complain of the defendant, and for cause of action allege:

## I.

"That Hageman and Pond, Inc., is now and at all times herein mentioned was a corporation organized and existing under the laws of the State of Delaware and authorized to do business in the State of Wyoming.

## II.

"That Hageman Properties, Inc., is now and at all times herein mentioned has been a corporation organized and existing under the laws of the State of Delaware and authorized to do business in the State of Wyoming.

## III.

"That on the 6th day of December, 1947, and for a long time prior thereto and at all times since said date, the plaintiffs herein were and now are the owners and holders, by assignment, of a certain Oil and Gas Lease Buffalo Serial No. 037263 issued by the United States of America, as lessor, to Curt A. Nadler, as lessee, on the first day of August, 1944, which lease embraced, with other lands, the following described tract of land in Big Horn County, Wyoming, to-wit: Northwest quarter of the Northeast quarter (NW¼NE¼) of Section Twenty-five (25), Township Fifty-one (51) North, Range Ninety-three (93) West of the Sixth Principal Meridian; said lease being subject to a royalty to the United States of America under the terms of said Oil and Gas Lease, and subject also to an overriding royalty of five (5%) of oil and gas produced therefrom, payable to Curt A. Nadler, or his assigns.

## IV.

"That the above described 40-acre tract is situated upon an oil and gas structure known as 'Torchlight

Dome', and plaintiffs allege, upon information and belief, that a sand stratum known as the Frontier Sand underlies said 40-acre tract at depth of approximately 700 feet below the surface thereof, and that a sand stratum known as the Embar sand underlies said 40-acre tract at a depth of approximately 3200 feet below the surface thereof, and that a sand stratum known as the Tensleep sand underlies said 40-acre tract at a depth of approximately 3400 feet below the surface thereof, and that the formation known as the Madison Lime underlies said 40-acre tract, and that the top of said Madison Lime would be found at a depth of approximately 3600 feet below the surface of said 40-acre tract, and that on December 6, 1947, and at all times since said date, neither the Frontier sand, nor the Embar sand, was productive of oil in commercial quantities on said 40-acre tract or in the immediate vicinity thereof, and that on December 6, 1947, and at all times herein mentioned, said 40-acre tract of land was untested and unexplored for oil or gas production from the Embar sand or the Tensleep sand or the Madison Lime, and the value of said 40-acre tract for oil and gas purposes was unproven and unknown, but plaintiffs allege that both the Tensleep sand and the Madison Lime were productive of oil in commercial quantities in the vicinity of the above described 40-acre tract, and the plaintiffs herein desired to have the said 40-acre tract of land tested for oil production from the Embar sand, the Tensleep sand and the Madison Lime, by having a well drilled on said 40-acre tract to the depth of the Madison Lime, unless oil in commercial quantities was found at a lesser depth.

## V.

"That on or about the 6th day of December, 1947, the plaintiffs herein, as owners of said Oil and Gas Lease (subject to overriding royalty of five per cent (5%)

payable to Curt A. Nadler), entered into a contract with the defendant to explore and test and develop said 40-acre tract for the production of oil and gas by the drilling of a well on said tract of land above described to the depth of the Madison Lime, unless oil or gas in commercial quantities was encountered at a lesser depth, or unless the defendant should encounter impenetrable substances which would prevent the drilling of said well; and in consideration of defendant's covenant and agreement to drill a test well on said 40-acre tract above described and to continue the drilling thereof without interruption until the Madison Lime was encountered unless oil or gas in commercial quantities was encountered at a lesser depth, or unless he encountered impenetrable substances which would prevent the drilling of said well, the plaintiffs agreed that defendant should retain the net proceeds of seventy-five per cent (75%) of all oil produced from said well until the sum of Fifty-five Thousand Dollars ($55,000.00) should be paid, and that when the expenses of drilling and connecting the well were fully paid, the division of net proceeds derived from the operation of said lease would be fifty per cent (50%) thereof to the defendant and fifty per cent (50%) thereof to plaintiffs herein. By the terms of said agreement, the drilling of said well was to be commenced by the defendant within sixty (60) days after permission was granted by the United States Geological Survey to commence the drilling of a well on said tract of land above described. That said Agreement was thereafter reduced to writing and duly executed and acknowledged by plaintiffs herein, and same was agreed to by defendant herein, and a full, true and correct copy of said Agreement is hereto attached and marked Exhibit 'A' hereof. Defendant agreed to drill said test well to the depth specified in said Agreement at his own cost and expense, subject, however, to reimbursement out of the proceeds from seventy-five per cent (75%) of oil

produced from said 40-acre tract of land above described, and defendant, for the consideration above mentioned, agreed to faithfully keep and perform on his part all of the terms of said agreement.

## VI.

"That pursuant to the terms of said Agreement, a copy of which is hereto attached and marked Exhibit 'A' hereof, Defendant on or about the 15th day of December, 1947, entered into possession of said premises described in said agreement, and made thereon a location for the well to be drilled by Defendant, and Defendant leveled the grounds at the said well location preparatory to the drilling of said well, and defendant also constructed a road to said well location.

## VII.

"That if Defendant had applied to the United States Geological Survey for permission to drill a well on the above described forty acre tract of land, permission would have been granted by the United States Geological Survey on or before December 15, 1947, to commence the drilling of a well on said tract of land above described.

## VIII.

"That plaintiffs have duly kept and performed on their part all of the terms and conditions of said operating agreement, a copy of which is hereto attached and marked Exhibit 'A' hereof; and Plaintiffs on or about January 12, 1948, demanded of Defendant that he keep and perform the terms of said agreement on his part to be kept and performed; but defendant has failed and refused to keep and perform the terms of said Agreement on his part, and defendant has failed and refused to drill a well upon the premises hereinabove described

for oil to the depth specified in said agreement, or to any depth whatsoever; and the drilling of said well has not been prevented by any impenetrable substances encountered therein, or any impenetrable substances that would be encountered in drilling said well to the Madison Lime.

## IX.

"That the reasonable cost of drilling said well to the depth specified in said agreement, (exclusive of the value of machinery, equipment and casing which would be removable in case operations resulted in a dry hole), is and at all times herein mentioned was Fifty Thousand ($50,000.00) Dollars.

## X.

"That by reason of the premises and the default of the Defendant herein, Plaintiffs have been damaged in the sum of Fifty Thousand ($50,000.00) Dollars.

"WHEREFORE, Plaintiffs pray Judgment against the Defendant for recovery of the sum of Fifty Thousand ($50,000.00) Dollars, with interest thereon at the rate of seven per cent (7%) per annum from the 6th day of December, 1947, together with costs of this action, and for such other relief as to the Court may seem appropriate."

Exhibit "A" referred to in the petition was signed by the plaintiffs but was not signed by the defendant. Aside from the signatures by the plaintiffs, it is as follows, to-wit:

## "OPERATING AGREEMENT

"THIS INDENTURE, Made and entered into on this 6th day of December, 1947, by and between HAGEMAN AND POND, INC., a Delaware Corporation with its

principal place of business at 60 East 42nd Street, New York, N. Y., HAGEMAN PROPERTIES, INC., a Delaware Corporation with its principal place of business at 60 East 42nd Street, New York, N. Y., HOWARD C. HAGEMAN, of 60 East 42nd Street, New York, N. Y., and WILLIAM M. HANLON, of Shelby, Montana, PARTIES OF THE FIRST PART, and BILL CLARK, of Billings, Montana, hereinafter referred to as OPERATOR, PARTY OF THE SECOND PART,

"W I T N E S S E T H:

"THAT WHEREAS, the parties hereto are the owners by assignment of that certain Oil and Gas Lease, Buffalo Serial No. 037263, heretofore issued to Curt A. Nadler on the 1st day of August, 1944, which lease embraces, with other lands, the following described tract, to-wit: The Northwest Quarter of the Northeast Quarter (NW¼NE¼) of Section Twenty-five (25) in Township Fifty-one (51) North, Range Ninety-three (93) West of the Sixth Principle Meridian, Big Horn County, Wyoming;

"Said lease being subject to a royalty to the United States of America under the Oil and Gas Lease Buffalo Serial No. 037263, and an overriding royalty of Five (5%) per cent, payable to Curt A. Nadler or his assigns.

"AND WHEREAS, the parties hereto are the owners of said Oil and Gas Lease in the following proportions: Hageman and Pond, Inc., a one-eighth (⅛) interest; Hageman Properties, Inc., a one-eighth (⅛) interest; William M. Hanlon, a one-fourth (¼) interest; Bill Clark, a one-half (½) interest.

"AND WHEREAS, the parties hereto desire to develop said lands for oil and gas.

"NOW THEREFORE, in consideration of the covenants and agreements of the parties hereto as herein-

after set forth, it is hereby mutually agreed as follows:

"1. Operator agrees that within sixty (60) days after permission is granted by the United States Geological Survey, to commence the drilling of a well on said tract of land above described, and to continue the drilling thereof without interruption until the Madison Lime shall have been encountered, unless oil or gas in commercial quantities is encountered at a lesser depth, or unless he encounters impenetrable substances which would prevent the drilling of said well. Operator also agrees, if oil is discovered in commercial quantities, to equip said well to produce the oil into tanks to be located on the premises, for a total sum of Fifty-five Thousand ($55,000.00) Dollars.

"2. It is further agreed that Operator will retain the net proceeds of seventy-five (75%) per cent of all oil produced from said well until the said Fifty-five Thousand ($55,000.00) Dollars shall have been paid, and shall distribute the remaining twenty-five (25%) per cent as follows: To Hageman and Pond, Inc., and Hageman Properties, Inc., six and one-fourth (6¼%) per cent each; and to William M. Hanlon, twelve and one-half (12½%) per cent, it being understood between the parties hereto that this last named 12½% shall be paid in cash. When the expenses of drilling and connecting said well shall have been fully paid, the division of the net operating proceeds shall be in the following manner: Hageman Properties, Inc., Twelve and one-half (12½%) per cent; Hageman and Pond, Inc., Twelve and one-half (12½%) per cent, William M. Hanlon, Twelve and one-half (12½%) per cent; Bill Clark, Fifty (50%) per cent; Hageman Properties, Inc., Six and one-fourth (6¼%) per cent for the account of William M. Hanlon; Hageman and Pond, Inc., Six and one-fourth (6¼%) per cent for the account of William M. Hanlon.

"3. Operator agrees to submit a monthly statement of the receipts and expenses on the 20th day of each month, for the production of the preceding calendar month, and will make remittances of the amount due at that time.

"4. The parties hereto agree to execute such division orders as may be necessary to sell and dispose of the oil produced, and such other documents as may be required by the United States Government in connection with said operations.

"5. The contract of December 28, 1944, between William M. Hanlon and Howard C. Hageman, providing for the operations of this property, among others, is modified to the extent that on the first well drilled on the property hereinbefore described, twelve and one-half (12½%) per cent of the net proceeds thereof shall be paid in cash to William M. Hanlon.

"6. This Agreement shall be binding upon the respective heirs, administrators and assigns of the parties hereto.

"IN WITNESS WHEREOF, we have hereunto set our hands this 6th day of December, 1947."

Counsel for the defendant contends that the ruling and judgment of the trial court was correct, on the following grounds: first, the contract was never consummated, and that it clearly appears that the oral contract was to be reduced to writing and signed by all the respective parties; second, that it appears by the terms of the contract that it was not to be fully performed within one year, and consequently comes within the terms of the statute of frauds; third, that the contract comes within the fifth subdivision of the Statute of Frauds (Section 5-101, Wyo. Comp. St. 1945) which provides that every agreement or contract for the sale of

real estate must be in writing and signed by the party sought to be charged; fourth, that the defendant in any event was not in default at the time of the commencement of this action for the reason hereinafter stated.

The case before us presents questions of the gravest doubt. We have concluded that they ought not to be decided on a demurrer to the petition, but that we should have all the facts and circumstances in the case before us before a final decision thereon. We shall, briefly, proceed to give some of the reasons therefor. We shall discuss the details only so far as to make this opinion intelligible, without, however, overlooking the main arguments made by the respective counsel herein.

A. The first contention is, as above mentioned, that the contract was never consummated. A complete annotation on the subject is contained in 122 A. L. R. 1217-1277, and 165 A. L. R. 756 and subsequent pages. See also 17 C. J. S. 390-395; 1 Williston on Contracts (Rev. Ed.) pages 59-67, 12 Am. Jur. 523-524. A cursory reading of the notes in the annotation will show how the courts have struggled with the question, and how doubtful it frequently is to come to a satisfactory conclusion thereon. The courts generally hold that whether or not a contract is to be effective only when reduced to writing and signed by all the parties is mainly a question of intention. In 122 A. L. R. 1248-1250, it is said: "The fact that parties to negotiations contemplated the drawing and execution of a formal written contract is regarded in numerous cases as evidence that they intended the prior oral or informal agreement, * * * to be merely tentative and not final. Indeed, this circumstance has been considered as 'strong evidence' that the parties did not intend that the negotiations should amount to an agreement prior to the execution of the formal writing. * * * It has been said that if the parties stipulate for a formal written agreement expressive of

their intention, there is a strong presumption that no contract is made until the formal instrument is prepared and executed, also that where there is a statute requiring that a contract be reduced to writing, there can be no presumption of an intention to consummate the contract in any other form." See the cases cited, and among others the case of Atlantic Coast Realty Co. vs. Robertson's Ex'r., 135 Va. 247, 116 S.E. 476, which quotes from Ridgway vs. Wharton, 6 H. L. C. 268. See also the opinion of Lord Blackburn in the case of Rossiter et al. vs. Miller, 3 App. Cas., (Law Rep. 1877-8) 1124, 1152; Pollock on Contracts (11th Ed.) page 34; 1 Williston on Contracts (Rev. Ed.) page 64, note 1.

Counsel for defendant contends that the circumstances in this case clearly show that it was the intention of the parties that a written contract was to be drawn and signed by all the parties, and that the case of Summers vs. Life Insurance Co., 12 Wyo. 369, 75 P. 937, 66 L. R. A. 812 is decisive on the point here discussed. The decision was by the late Justice Potter. He cites with approval the case of Mississippi & Dominion Steamship Co. vs. Swift, 86 Me. 248, 29 Atl. 1063, enumerating some of the circumstances in determining as to whether or not an oral contract should be considered as the final contract of the parties, namely, "such as whether the contract is one usually put in writing; whether there are few or many details; whether the amount involved is large or small; whether it requires a formal writing for a full expression of the covenants and promises; and whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations." See also Gilbert v. Texas Co. (Tex. Civ. App.) 218 S. W. 2d 906, 941-942. Other circumstances may be added in the case at bar, namely that it involves a transfer of an interest in real property which ordinarily under the

Statute of Frauds must be in writing and signed by the party sought to be charged; that the contract was in fact reduced to writing and submitted to the other party; the fact that the written instrument contains a blank space where the defendant was expected to sign his name, (Rork vs. Las Olos Co., infra) and perhaps the fact that he actually refused or neglected to sign it. Moreover, the contract in question relates to an oil and gas lease from the United States. Circular 1782 of the Bureau of Land Management, Department of the Interior, Part 192 relating to Oil and Gas Leases, Section 192.141 provides: "Requirements for filing of transfers. (a) All instruments of transfer of a lease or an interest therein, including assignments of record title, working, or royalty interests, operating agreements and subleases, must be filed for approval within 90 days from the date of final execution and must contain all of the terms and conditions agreed upon by the parties thereto, together with a statement over the transferee's own signature with respect to citizenship and interests," etc. The regulation contemplates that any operating agreement, as the written instrument herein involved is designated, must be signed by the operator, and his own signature must be attached. The parties doubtless had this regulation in mind at the time of the oral negotiations, and is one of the factors and circumstances to be considered in determining the question whether or not the contract was intended to be in force until signed by all parties to the contract. See also comment on Section 221.19 of Oil and Gas Operating Regulations mentioned below.

In Ridgway vs. Wharton, 6 H. L. C. 268 mentioned supra, the chancellor said among other things: "I think that sending to the solicitor to desire him to prepare an agreement * * * show(s) * * * rather that he left it to the solicitor to prepare an agreement, in order that

when they (the parties) met, the matter might be properly discussed." And so it was said in Rork vs. Las Olas Co., 156 Fla. 510, 23 So. 2d 839 that: "we draw attention to the circumstance that the written draft here involved was prepared by appellee's attorneys for signature and acknowledgment, not only by appellant, but also by appellee. This demonstrates to us the intention of appellee that both parties should execute the agreement which embodied the terms and conditions of the transaction." See also W. T. Grant Co. vs. Jaeger, 224 Ill. App. 538. However, it was stated in the case of Mississippi & Dominion Steamship Co. vs. Swift, 86 Me. 248, 41 Am. St. Rep. 545, 554: "Still with the aid of all rules and suggestions, the solution of the question is often difficult, doubtful and sometimes unsatisfactory." The petition alleges that the defendant agreed to the written instrument. That, by implication—for we must construe the petition liberally—seems to be an allegation admitted by the demurrer that the contract was to be effective without defendant's signature. Counsel for defendant says that the allegation is false, in view of the fact that the defendant did not sign the contract. It is doubtless true that it is rather anomolous that a party should agree to the terms of a written instrument, and at the same time refuse to sign it. Still we must accept the foregoing allegation as true for the purposes of the case now before us. In any event, it is clear that the court will be in better position to satisfactorily determine the question here discussed after trial of the case. Taking everything into consideration, we think that we should not determine the question until all the testimony and evidence is before us.

B. As to the claim that the contract could not be performed within one year, and that it is hence within the first provision of Section 5-101, Wyo. Comp. St. 1945 that "Every agreement that by its terms is not to be

performed within one year from the making thereof," must be in writing and subscribed by the party charged therewith. It is argued by counsel for defendant that it would be possible to complete the contract only on the theory that the well to be drilled would be a dry hole; that if such were the case the plaintiffs ought not to have any damages; that upon the theory that the well to be drilled would be producing, the acts to be performed thereafter could not possibly be performed within one year. It is said in the comment to Section 198 of the Restatement of the Law of Contracts, as follows: "The words 'cannot be fully performed' must be taken literally. The fact that performance within a year is highly improbable or not expected by the parties does not bring a contract within the Statutes." But see 37 C. J. S. 559, Note 25. We may, of course, take judicial notice of the fact that oil and gas wells ordinarily, if producing at all, will be productive for many years, and it is probably on that account that the trial court concluded that performance in one year is substantially impossible. Even if we were to concede that —we do not decide the point—still so far as the record before us shows that would be true so far as the defendant is concerned, but it is uncertain so far as the plaintiffs are concerned. It is alleged that the defendant agreed to the provisions of Exhibit "A" the instrument in writing. It provides that the defendant has a one-half interest in any oil and gas wells on the premises. For the purposes of the case now before us we may regard that as the equivalent of a conveyance by the plaintiffs to the defendant of that interest. The contract is executed so far as the plaintiffs are concerned, unless it be by reason of provisions of subdivision 4 which provides that "the parties hereto agree to execute such division orders as may be necessary to sell and dispose of the oil produced, and such other documents as may be required by the United States Govern-

ment in connection with said operations." Whether this clause is of any importance at all (see Regulation 221.19 mentioned below) or contains merely formal provisions, we are not prepared to say. The point has not been argued and we do not decide it. If the clause contains merely matters of formality, we may regard the contract as a completed contract on the part of the plaintiffs insofar as the statute of frauds here considered is considered. The prevailing view appears to be that "if performance on one side can be fully executed within a year, and is so executed, the contract is not within the Statute." 2 Williston on Contracts, (Rev. Ed.) Section 504. There are decisions to the contrary with which Williston agrees. See also 49 Am. Jur. 396-397, section 37. But for the purposes of the case now before us, we shall accept the prevailing view.

C. It is the further contention of the defendant that the contract comes within the statute of frauds by reason of the fact that it involves the transfer of an interest in real property. Oil and gas interests in land are real property. Denver Joint Stock Land Bank vs. Dixon, 57 Wyo. 523, 122 P. 2d 842, and in the absence of countervailing factors, the contention herein would seem to be correct. It is stated in 2 Corbin on Contracts, Section 419: "The courts uniformly hold that the oral promise to pay the price is enforceable after its bargained-for equivalent, the transfer of the land, has been executed. The courts do not like to let a buyer get and keep the land without paying the agreed price." Applied to the case at bar, that means that courts would not like the defendant to get and keep the one-half interest in the oil and gas lease without paying the equivalent—to carry out the agreement to drill the oil well. Of course this implies that a conveyance was made and accepted. And unless the facts herein show an acceptance of the one-half interest, then the contention herein that the

contract is within the statute of frauds is doubtless correct. Under the oral contract, as pleaded, the defendant received a present interest in the oil, which, of course, was ineffective under the statute mentioned. So plaintiffs drew up the written instrument, which for the purposes of the case now before us (we do not know as to the future) may be regarded as a transfer of the interest. The petition as already stated contains the averment that the defendant agreed to the written instrument. The petition further contains the allegation: "That pursuant to the terms of said agreement, a copy of which is hereto attached, and marked Exhibit 'A' hereof, defendant on or about the 15th day of December, 1947, entered into possession of said premises described in said agreement, and made thereon a location for the well to be drilled by defendant, and defendant leveled the grounds at the said well location preparatory to the drilling of said well, and defendant also constructed a road to said well location." Since we must construe the petition liberally, the facts so pleaded, taken together, may when the details are known, indicate to some extent the acceptance of the transfer above mentioned. At least we are not fully satisfied on the point, and believe that we should not finally decide it until we have all the evidence thereon before us.

D. It is also contended by the defendant that he is not in default for the reason that the contract pleaded states that defendant was not compelled to drill until 60 days after permission to do so should be granted by the United States Geological Survey, and that it does not appear that any such permission has yet been granted. Counsel for plaintiffs contend that it was the duty of the defendant to make application to do so, and the petition alleges that if that had been done, permission would have been granted. The petition does not disclose how plaintiffs know that to be a fact. However,

in view of the demurrer we should accept the fact stated in the petition as true. But see discussion below.

We think that, as a general proposition, when a man undertakes to drill an oil well—or undertakes any other task—it is his duty to do any and all things, within reason, which are necessary to be done, and which can be done through his own efforts without co-operation on the part of the other contracting party. If then it is true, as alleged in the petition, that an application to drill, made by defendant, would have been granted by the proper authority of the United States, then he should have made that application. The rules and regulations of the Government of the United States in connection with the oil lease in question here were not discussed in the briefs of counsel, nor were they before us at the time of the oral argument herein. They have been furnished to us since that time. Some of them are contained in the Code of Federal Regulations Title 30, Mineral Resources, Chapter II, Geological Survey, part 221 relating to Oil and Gas Operating Regulations. Section 221.19 provides in part: "A 'designation of operator' shall be submitted to the supervisor, in a manner and form approved by the supervisor, prior to commencement of operations. * * * A designation of operator will be accepted as authority of operator or his local representative to fulfill the obligations of the lessee and to sign, as operator, any papers or reports required under these oil and gas operating regulations." We have also before us Form 9-1123, evidently made pursuant to the foregoing regulation. This form requires the signature of the lessee of the oil and gas lease, but not the signature of the "operator." Since plaintiffs were presumably the owners of record of the lease, it would seem that they should have complied with the foregoing regulation. Since the point has not been properly argued, we do not finally pass upon it, and

must leave the determination thereof to the trial court.

Section 221.18 of the same regulations provides: "The lessee shall comply with the terms of the lease, and of these regulations and any amendments thereof, and with the written instructions of the supervisor, shall take all reasonable precautions to prevent waste, damage to formations or deposits containing oil, gas, or water or to coal measures or other mineral deposits, and injury to life or property, and before drilling or other operations are started, *shall have submitted a satisfactory bond.*" (Italics supplied). It does not appear as to whether or not the required bond was furnished. It would seem to be doubtful that a bond furnished by the defendant (alone) would have been sufficient. But that question has not been argued, and we do not now express any definite opinion thereon.

The order sustaining the demurrrer and the judgment herein are reversed, and the cause is remanded to the district court of Big Horn County for further appropriate proceedings.

KIMBALL, C. J., and RINER, J., concur.