## UNITED STATES FIDELITY & GUARANTY COMPANY v. COOK

(No. 1691; Nov. 24, 1931; 5 Pac. (2d) 294)

For the plaintiff in error there was a brief by *Gillette & Clark,* of Denver, Colorado, and *A. D. Walton,* of Cheyenne, Wyoming, and oral argument by *Mr. Walton.*

358

For the defendant in error there was a brief by *W. L. Walls* and *John Dillon*, of Cheyenne, Wyoming, and oral arguments by *Mr. Walls* and *Mr. Dillon*.

Blume, Justice.

The petition in this case alleges, briefly, that the appellant, in September, 1924, received from Cook, the plaintiff, $2280.98 to the use of plaintiff and without consideration; that the money was obtained from him by duress and coercion; that plaintiff had been paying teller of the First National Bank of Cheyenne, Wyoming, which on July 9, 1924, went into the hands of a receiver, and the defendant, a surety company, had insured the bank, among other things, against dishonesty of its employees; that after the closing of the bank, it was claimed that there was a shortage in the accounts of the plaintiff in the sum of $2280.98; that thereafter one Clarence B. Tyler, manager and agent of the defendant surety company, accused plaintiff of having stolen and embezzled the amount of this shortage, which plaintiff denies; that Tyler threatened that unless plaintiff would deliver the amount of the shortage to him, he would have plaintiff arrested, prosecuted for embezzlement, sent to the penitentiary, blacklisted so that plaintiff could never again obtain any bond, or other employment in a bank, and cause him and his family to be disgraced; that Tyler made these threats to both plaintiff's sister and mother, these threats being communicated to plaintiff; that plaintiff paid the money above mentioned to Tyler against his will and because of the threats above mentioned and in the fear that he would carry them out. Judgment is prayed for the amount so paid, with interest. Issues were duly joined on the allegations.

Plaintiff paid the sum sought to be recovered on September 27, 1924. In the spring of 1925, he was indicted in the federal court for embezzlement; he was tried in the fall of 1925 and acquitted. He made demand on the defendant for the return of the money paid it in December, 1925. The case against the defendant has been tried twice, the first time in April, 1928, with the Hon. C. O. Brown presiding. That trial resulted in a verdict for plaintiff herein. A motion for a new trial was granted, and the case was tried the

second time in April, 1930, with the Hon. V. J. Tidball presiding. That trial, too, resulted in a verdict in favor of the plaintiff, and from a judgment thereon, the surety company, defendant herein, has appealed. Since it is claimed that there is not sufficient evidence to sustain the verdict, it is necessary to give a brief review thereof.

It appears that in 1924 the plaintiff and respondent herein was about 23 years of age; that he quit school at the age of about 15 and began work in the First National Bank of Cheyenne as a messenger; that he subsequently became teller of the bank and at the time that the bank closed was its head teller. Considerable evidence was introduced on the question whether or not the plaintiff was guilty of embezzlement. It is necessary to give merely an outline. It appears that the bank closed each day at three o'clock in the afternoon. Immediately thereafter the tellers made up a statement. At 3 o'clock on July 8th, 1924, the day before the bank was taken over by the comptroller of the currency, plaintiff counted the money and other items on hand, totalling $93,330.22, made up of nine different items, of which $27,788 consisted of bank notes—currency. This amount was subsequently changed by plaintiff (in pencil) to $25,-478.00, making a difference of $2310—the amount of the shortage claimed herein. It appears, however, that while the bank was nominally closed at three o'clock, it was not so in fact, but that considerable business was done thereafter, and generally up to about 5.30 in the afternoon, so that the currency on hand at three o'clock might be reduced subsequently by checks or other items drawn against it. Plaintiff testified that it was in this manner that the $27,788 of currency on hand at three o'clock of July 8 was reduced by $2310, and that the checks or other items by which this reduction took place must have been lost in the confusion attendant on the bank passing into the hands of the comptroller of the currency. Plaintiff stated that, on account of the business always done after three o'clock and until late in the afternoon, a final statement was never made on

that day, but that this was always done the next morning; that the checks and other items of business would be put together, placed in the vault over night, and then counted the next morning; that some of the figures, however, on the teller's sheet, made at three o'clock, might be corrected on the same day—apparently to call special attention the next morning to the fact that the figures made at three o'clock of the previous day were not correct. It appears further, that plaintiff was not permitted to revise his figures on the morning of July 9th, 1924; that at that time the bank passed into the hands of the comptroller of currency, and he, plaintiff, instead of making up his final figures as usual, was not permitted to do so, but was put to work at protesting checks; that he did so for two days; that thereafter he went fishing for about three days, and only upon his return was his attention called to the apparent shortage; that he then attempted to find the discrepancy, by hunting for the checks or other items, which were lost; that he wanted to go over the various accounts in the bank's books to see if he could not refresh his recollection whether this or that person might not have drawn checks, but that he was not even given the opportunity to do that. The testimony shows that the item of $27,788 above mentioned and made up at three o'clock of July 8 was not the only one that was incorrect. Two others were. The one representing silver, of $901.44, actually was larger by $4.10. And another item was increased by $60.00—this amount, represented by a coupon, for some unexplained reason being found sometime after plaintiff returned from fishing in a basket on top of the cage where plaintiff had been working. It further appears that about a year prior to July, 1924, the plaintiff was short the sum of $600, but that this occurred by reason of a check being lost and found in the basement of the building. Twenty four persons, it seems, had access to the lower part of the vault at all times up to the morning of July 9th. The directors met in the bank July 8th, remaining until two or three o'clock at night. Early on July 9th, a lot

of papers of various kinds, which had accumulated, were hauled away from the basement of the bank building.

Some time during August, 1924, the plaintiff had several talks with Mr. Abbott, formerly president of the First National Bank, in regard to the shortage of $2310. He went as far as to make arrangements with the Building and Loan Association at Cheyenne for borrowing about $1650 on a second mortgage on his mother's property, apparently with the intention to apply the amount on the shortage. Just how far Mr. Abbott went in his talks with plaintiff is not quite clear, even from plaintiff's own testimony. It seems to have been intimated, at least, that the matter might get into the courts; perhaps plaintiff understood that it might come to a criminal prosecution, unless the shortage were made good. Plaintiff testified, however, that Mr. Abbott never threatened him with a criminal prosecution, and that notwithstanding the arrangements with the building and loan association—which were not obligatory until finally consummated—he had made up his mind not to pay the shortage, and it is clear that he at all times protested, and protested vigorously, that he was not responsible therefor. Thus the matter stood till September 16, 1924. At that time Clarence P. Tyler, representing the defendant, came to Cheyenne from Denver. He called up plaintiff's sister, then working in the telephone office, asking to see her during the noon hour. According to her testimony Tyler, upon seeing her at noon, took her into a private office, and stated in substance that the surety company had been notified of the shortage; that he had absolute proof that plaintiff took the money; that the latter changed the books the morning when the bank closed; that this money had to be paid; and that if plaintiff did not pay it, he would go to Leavenworth. This statement, she testified, came as a great shock to her, as she had never heard of the shortage, and that she communicated the conversation to her brother. That afternoon Tyler called the plaintiff at the place where he was then working, met him in the evening in an office, and according

to plaintiff's testimony, Tyler stated that "we (the defendant) have paid the bank, and now you will have to pay us;" that if plaintiff didn't pay the money, he would be blacklisted with every surety and bonding company; that plaintiff was a young man; that his whole future depended on the banking business; that he would never be able to get a job without a bond; that he would be arrested and prosecuted for embezzlement and would be sent to the penitentiary, if he did not pay—and to go home and think it over seriously and let Tyler know the first thing in the morning. Plaintiff, so he stated, met Tyler the next morning, when substantially the same thing was told him as in the evening, and that, if plaintiff paid, no one would know anything about it, except himself and the surety company. That day Tyler went back to Denver. Apparently on three successive days thereafter, or oftener, he telephoned to plaintiff, according to the latter's testimony, reminding him of what he should do, and indirectly repeating the threats previously made. On September 22, plaintiff received a wire from him stating: "Necessary have your advices when remittance will reach me. Answer." Induced by these threats, so plaintiff testified, he finally promised to raise the money, which he did, partially through the building and loan association, and partly by borrowing money from or through friends. In answer to the telegram from Tyler, he wired, on September 22: "Building and loan deal held up account abstract. Will cancel loan and have house sold in a couple of days. Will phone you." On September 25, he again wired, saying: "Special delivery letter mailed you this morning regarding payment." On the next day, apparently having gone as far as Greeley, he wired: "Had to return to Cheyenne account of car trouble and bad storm. Will arrive Saturday." On the following day plaintiff wired from Greeley, Colorado: "Will be in Denver 3 p. m." The money was paid on that day, under protest, a small amount thereof being subsequently repaid. Plaintiff testified that his state of mind from September 16th to the 27th was in

a bad condition; that he did not sleep more than five or six hours the whole time; that he was so worried and upset that he didn't know what to do; that he was considering the one thing impressed by Tyler on his mind, namely, the threats made by the latter; that he was scared; that these threats "convinced" him, and that he would not have paid the money except for them. These threats were denied by Tyler.

1. The defendant made a motion, both at the close of plaintiff's case, and again at the close of the whole case, for a directed verdict in favor of the defendant on the ground, among others, that the facts stated in the petition do not constitute a cause of action. The motions were overruled and this is assigned as error. It is stated in the brief, that the petition is not good because it pleads that the money was paid for the use of the *defendant,* instead of for the use of the plaintiff. This claim is not supported by the record before us. Again, the petition states that the threats were made on or about the 20th day of August, 1924, and that the money was paid on September 24th thereafter, and it is argued that it should follow as a matter of law that a payment made 35 days after the threats were made could not be held to have been made against the will of the plaintiff. We need not determine whether that is so or not. The record in this case shows conclusively, and without objection to the testimony, that if any threats were made by Tyler, they were made on or after September 16th, 1924, so that, if necessary, we should regard the petition amended in that respect. Chicago & Northwestern Ry. Co. v. Ott, 33 Wyo. 200, 212, 237 Pac. 238, and cases there cited; McDonald v. Mulkey, 32 Wyo. 144, 231 Pac. 662. Construing the petition liberally, and in the light of what we have said, we think, the assignment of error should be overruled.

2. The court, by Instruction 3, told the jury that:

"If you believe from the evidence in this case that the plaintiff through larceny, theft or other dishonest act took

$2310 from the funds of the First National Bank of Cheyenne, Wyoming, then the plaintiff cannot recover in this case, even though he paid the sum of $2310 to the defendant because of duress.''

Appellant claims that the instruction did not go far enough and that it also should have told the jury that plaintiff could not recover if the money was lost by plaintiff's negligence, and that the court erred in refusing to give offered instruction E, which embodied that idea. But we do not recall any testimony in the case which would have justified such instruction. Nothing in the testimony tended to show that plaintiff was guilty of any negligence. If he was guilty of anything, it was of embezzlement. He put the full amount of money, so he stated, together with all papers connected therewith, into a conveyance and into the bank's vault on the evening of July 8th, 1924, when he left the bank, and so far as appears, without negligence. Though the bundle or bundles of money and papers may not have been interfered with by anyone—to determine the amount of cash on hand, for example—during the meeting or meetings which were held at the bank till late in the night or early the next morning, charge was taken thereof by the bank examiner the next morning, without access thereto thereafter on the part of the plaintiff.

Furthermore, we doubt the correctness of the legal proposition advanced by counsel for appellants. They rely on 48 C. J. 742, where it is said:

''But in order to recover moneys paid under duress, it must be shown, not only that there was duress, but also that the demand or duress was illegal, unjust or oppressive, and that it is against equity or good conscience for the payee to retain the money.''

We cannot see anything particularly objectionable in the statement as it reads, if it means that the demand, or alternatively, the duress, must be shown to be illegal, etc. The jury found that the plaintiff was not guilty of em-

bezzlement. That finding is, we think, amply sustained by the evidence, and we must accept it as correct. In view of that fact, there can be no question that the duress claimed to have been exercised in this case, was illegal, unjust and oppressive, for no one has the right to attempt to collect a mere debt by duress of threatened imprisonment, particularly in view of Section 1089, Wyo. C. S. 1920, which reads:

"* * * Whoever accuses or threatens to accuse * * * any person of any crime punishable by law * * * with intent to extort or gain from such person any * * * money or valuable security, or any pecuniary advantage whatsoever, or with any intent to compel the person threatened to do any act against his will, is guilty of blackmailing."

And is it not against equity and good conscience for the payee to retain the money so gained, at least when the indebtedness is disputed as in the case at bar? In Link v. Real Estate Co., 182 Mo. App. 531, 536, 165 S. W. 832, 833, the court, speaking of duress of goods, and money so obtained, says:

"The doctrine is one sounding in equity, and proceeds in general upon the theory that it would be inequitable and against good conscience for money or property so obtained to be withheld from the plaintiff (against whom duress has been used)."

48 C. J. 752, cited by counsel for appellant, goes somewhat further, and states:

"To render a payment compulsory, the duress must be illegal, unjust or oppressive. For instance, one cannot recover back money paid under compulsion, if it is just what he ought to have paid voluntarily."

We have examined the cases cited in Corpus Juris in the two places above mentioned, and there can be no doubt that a number of them give at least color to counsel's claim. We have, unfortunately, not been favored with the view of

counsel for respondent on these cases. In some of them, no duress was held to have existed, the courts incidentally, however, remarking that if the money should have been paid in any event, duress would make no difference. In others, "duress of property" was claimed, and it was held that if the demands were just, no complaint of duress could be made. In Dillon v. Johnson, 37 Tex. 47, there was an arrest, the facts of which do not appear clearly. The court held that a settlement subsequently made between the parties should, if just, be upheld. In Deshong v. City of New York, 176 N. Y. 475, 68 N. E. 880, it was held that money justly due and paid for a permit from the city could not be recovered, though payment was made under threat that an arrest would be made if the permit were not taken out. In McVane v. Williams, 50 Conn. 548, it was held that threats of arrest should have been pleaded, and that in the absence thereof, evidence thereof should not be permitted, the court further stating that there ought to be a finding as to the justice of the claim. In Wilbur v. Blanchard, 22 Idaho 517, 126 Pac. 1069, it was held that a man ought not to be able to recover back the reasonable value of goods stolen by him, though he made payment therefor under threats of prosecution. Similar in effect are Kronmeyer v. Buck, 258 Ill. 586, 101 N. E. 935; 45 L. R. A. N. S. 1182. We do not think these cases controlling here. Nor do we think that Houtz v. Board, 11 Wyo. 152, 70 Pac. 840, is in point, except, perhaps, in so far that we may gather from it that courts should not too readily construe a payment to have been made under duress. And it may be that a payment made, when the demand therefor is clearly just, should not be recoverable on account of duress of property, and that this should, generally, be true where the person from whom the demand is made has committed a crime out of which the demand has arisen. These points are not necessary to be decided. In the case at bar the jury found that the plaintiff was not guilty of any crime, and the same finding had been made by two other juries previously. And the

point to be decided here is, whether a person, who uses duress, by threats of prosecution, on the ground that plaintiff is guilty of embezzlement, can, though that is not true, nevertheless justify retention of the money obtained on the ground that it was lost by negligence, though such negligence is denied or disputed. A man, of course, ought to pay his debts, whether arising out of his negligence or otherwise. If paid it ought not to be able to be recovered upon slight grounds or upon trivial pretenses that the payment was involuntary. But at the same time a creditor has no right to take the law into his own hands or enforce his debt by unlawful means. He has no right to claim that he should be able to profit by his own wrong. Courts are instituted for suits to recover debts and to settle disputed claims. As stated in Hartford Fire Insurance Co. v. Kirkpatrick, 111 Ala. 456, 20 So. 651, 654.

"It was never contemplated in the law that either the actual or threatened use or misuse of criminal process, legal or illegal, should be resorted to for the purpose of compelling the payment of a mere debt, although it may be justly owing and due, or to coerce the making of contracts or agreements from which advantage is to be derived by the party employing such threats. Ample civil remedies are afforded in the law to enforce the payment of debts and the performance of contracts, but the criminal law and the machinery for its enforcement have a wholly different purpose, and cannot be employed to interfere with that wise and just policy of the law, that all contracts and agreements shall be founded upon the exercise of the free will of the parties, which is the real essence of all contracts."

To lay down a general rule that a disputed debt, as here, cannot be recovered if made under duress, no matter in what form, is, we think, going to a dangerous extreme. If that were true, not only could a man be threatened with imprisonment, or shut up in prison or other place of confinement, but he could be compelled to pay the sum demanded at the point of a gun without recourse to the civil courts. We are not willing to lay down a doctrine so inconsistent with our

present civilization, and we do not think that the cases above mentioned intended to go that far. It would seem to us to be a far sounder public policy to hold that in such case the creditor should be compelled, in the first instance, to resort to the courts in order to settle the dispute, rather than to resort to duress of the character stated, including duress claimed to have been used in the case at bar. Williston, in Section 1616, on Contracts, says in connection with threats of prosecution and recovery of money so obtained:

"There can be no question that there is duress within the modern meaning of the word, and the opportunities for abuse are too considerable, if the creditor is allowed to use such means to enforce a settlement, to make it wise to graft an exception on the general rule that transactions made under duress are voidable."

In his comment to Section 112 A of the Tentative Draft No. 9 of the Restatement of the Law of Contracts, he says:

"Duress inducing a person to perform his exact legal duty does not give him power to avoid his act; but where a claim is unliquidated *or the subject of an honest dispute,* even a reasonable settlement induced by duress is voidable." (italics are ours.)

A case in point would seem to be Richardson v. Duncan, 3 N. H. 508. There the plaintiffs were arrested and threatened to be sent to prison for tearing down an old barn and appropriating the lumber therein belonging to the defendant. An arrest was caused to be made by the defendant so he could get as much money out of the plaintiff as the house was worth. The plaintiffs settled with him for the sum of $62.50, and subsequently sued to recover the money back, on the ground that it was obtained by duress. The lower court nonsuited plaintiffs, apparently on the ground that the facts did not show duress. The judgment of the lower court was reversed, and the cause was sent back for a new trial. The precise point here involved was, it is true, not

discussed, but the holding of the court would seem to imply that if there was duress, recovery should be had. Another case in point is American Railway Express Company v. Hicks, 198 Ky. 549, 557. Plaintiffs claimed that money was paid to the defendant under duress, 249 S. W. 342, 345. The money was in fact paid only by one of the plaintiffs, for the other, but the court seems to ignore that feature in connection with the point under discussion. The trial court instructed the jury that if one of the plaintiffs lost the money through negligence, and it was paid in settlement of that claim or for the purpose of avoiding litigation, the plaintiffs could not recover, ''unless they believed that the same was obtained under duress.'' In other words, the quoted words were to the effect that if duress was used, plaintiffs could recover notwithstanding the fact that the money was lost by negligence, and the railway company complained of the insertion of the quoted words in the instruction. The court said on the point:

''The criticism of this instruction goes to the words quoted, it being contended that they should have been eliminated from the instruction. The foundation for this contention is that duress does not exist if in equity and good conscience the money should be returned to the one imposing the duress. The argument is that if one believes himself to have been wronged, and if the wrong includes a violation of the criminal law, it is not duress to force the wrongdoer to right the wrong by threatening him with a prosecution. There is authority for the contention. But the weight of authority is that threats of a prosecution for an offense of which the party is actually guilty, if they induce the threatened party to pay money that he would not have voluntarily paid, amount to duress for which a recovery can be had. The reason for the rule seems to be that in such case the threatener has perverted and abused the laws which were made for another purpose, and he is in no position to claim the benefits of a contract obtained in that way. 9 R. C. L. 719-720. The precise question does not seem to have been decided by this court. We are, however, inclined to adopt the rule of more uniform application and to hold that the qualification was not erroneous.''

3. It is argued by counsel for appellant that the evidence in this case does not show that the payment made by plaintiff to the defendant was made under duress. That threat of arrest and imprisonment may constitute duress has often been decided. 48 C. J. 749. The test whether it did or not in this case depends upon whether the plaintiff, in making the payment, had been deprived of the exercise of his free will. 9 R. C. L. 716. That, in turn, depends on the circumstances. The strength or weakness of the parties, their experience, their habits of persistency, and all the various circumstances must be considered. The jury saw both plaintiff and Mr. Tyler upon the witness stand, and they were in better position to determine at least some of the facts than we are. True, Mr. Abbott had impressed upon plaintiff the duty to return the money found to be short; plaintiff had, without doubt, considered doing so. Still, we cannot say that he was not telling the truth that prior to the time that Mr. Tyler came to Cheyenne he had made up his mind not to pay, and that he was in that frame of mind when Mr. Tyler came. The latter represented a party directly interested in having the shortage made up. Plaintiff was a young man, 23 years of age. He had his life before him; he had a mother and a semi-invalid sister. Some circumstances in the case were against him, and with the penitentiary staring him in the face, through the threatened acts of one whom he believed in the position to send him, the future doubtless looked dark and gloomy, perhaps sufficient to break even an iron will. A threat to be sent to the penitentiary, with an apparent ability to carry it out, may not appear serious to some young men, but it is likely that others would be stunned thereby as truly as by a physical blow. Taking all the facts and circumstances of this case into consideration, we think that whether the constant pressure brought to bear upon plaintiff so weakened his mind that he finally agreed to make payment was, we think, a question for the jury.

Nor do we think that about five days time for deliberation, and the opportunity of plaintiff to get counsel—which he did not embrace—changes the situation and makes the question of duress existing at the time of payment necessarily a matter of law. Two juries have now passed on the point, finding against the appellant each time. We should hesitate to say that both were wrong, unless the case were clear. Plaintiff stated that he was scared and that he could not think of anything else than the threats made by Tyler and that he had only a few hours of sleep during a number of days. Perhaps the longer he thought about it, the more dangerous the situation looked to him, as would be natural after so much loss of sleep. In fact, his serious state of mind seems to be indicated, when he took the trouble of sending a telegram both on the day before and the day of the time when payment was made. As was said by the Supreme Court of Wisconsin in the case of Coon v. Mettzler, 161 Wisc. 328, 154 N. W. 377, 379, L. R. A. 1916 B 667, after referring to some other cases:

"It is true that in each of these cases it was held that no duress was shown, and that in each case the fact that several days elapsed between the making of the threats and the payment of the money was considered as an important consideration in reaching the result. This is far from saying, however, that such a fact will in all cases negative duress, and such a holding would manifestly be illogical. The ultimate test, after all, is the condition of mind produced by the threats and existing at the time of the payment. It may well be that the lapse of a year or more without renewal of the threats (as in the case of Schultz v. Culbertson, 46 Wis. 313, 1 N. W. 19) between the giving of the note and its payment, should be held to be conclusive against any claim of duress in the payment, but in the last named case it was wisely said that 'Perhaps a jury would be warranted in finding that the original duress continued' had the note been paid soon after it was given."

We think the contention of appellant on this point should be overruled.

4. Error is assigned because the court refused to give an instruction to the effect that if the jury found that the money was paid in consideration of the promise of Tyler that plaintiff would not be prosecuted, their verdict should be for the defendant. We think the court's action was right. The rule contended for by counsel for appellant does not apply, if payment has been induced by duress, menace or oppression. In such case it can be recovered for the reason that the parties are not in *pari delicto*. Clifford v. Great Falls Gas Co., 68 Mont. 300, 216 Pac. 114; note L. R. A. 1918 C 73. While, therefore, the instruction asked may be correct as an abstract proposition of law, it was not applicable to the case at bar, at least without being modified as above indicated.

5. The appellant requested the court to give the following instruction to the jury, which was refused:

"You are instructed that if you find from the evidence that the plaintiff paid to C. B. Tyler the sum of Twenty-three hundred and ten dollars for the purpose of having the same paid by Mr. Tyler, or the defendant company, to the Receiver of The First National Bank of Cheyenne, Wyoming, and that said amount of money so paid was paid to the Receiver of The First National Bank of Cheyenne, Wyoming, by said Tyler, or his company, then your verdict should be for the defendant."

The plaintiff testified that Tyler told him, prior to September 27, 1924, that the appellant had paid the money to the Bank at Cheyenne. This was denied by Tyler. Asked why he did not have plaintiff pay the money direct to the bank, he answered, evidently also referring to the claim filed against the surety company by the receiver of the bank: "We have to keep our records complete, and we have to know when it is paid." The testimony is not altogether clear, but the impression gathered from it is that the surety company wanted to pay and satisfy the claim filed against it, and that in turn this payment should be satisfied by the

payment made by the plaintiff, and if that is correct, the requested instruction had in no event any application in the case.

Counsel for the appellant make the broad claim that when money is obtained by an agent to be paid over to his principal, the agent's liability ceases when payment has been made to the principal, no matter under what circumstances the money may have been collected. It would seem to be a strange doctrine that a man can so easily escape responsibility for his own wrong simply because he acts as agent for another. We are cited to Butler v. Livermore, 52 Barbour 570. In that case the plaintiffs sought to recover money paid for certain stock, alleged to have been sold to them by fraudulent representations. Without analyzing the case in detail, the decision at least partially turned on the fact that the plaintiffs in that case sued the defendants as sellers of the stock, when the evidence showed that they were acting only as agents. The court held that in the proper suit the agents could be held responsible for their own wrong, and referring to some cases dealing with extortion practiced by the agent, says:

"Obtaining money by fraud or fraudulent representations cannot be called obtaining it by compulsion or extortion."

In 2 C. J. 823, the rule is stated as follows:

"Where money is knowingly illegally demanded and received by an agent from a third person by compulsion or otherwise, the agent cannot exonerate himself from personal responsibility by paying it over to his principal."

We think, accordingly, that the assignment of error should be overruled.

We have discussed all the points which we think are necessary to be discussed. We have found no reversible error

376

in the record, and the judgment of the trial court should, accordingly, be affirmed. It is so ordered.

*Affirmed.*

KIMBALL, Ch. J., and RINER, J., concur.