Gertrude D. TORGESON, Executrix of the Estate of A. C. Torgeson, Deceased, Appellate (Substituted for A. C. Torgeson, Defendant below),

v.

Vaughan B. CONNELLY, Appellee (Plaintiff below).

No. 2874.

Supreme Court of Wyoming.

Dec. 16, 1959.

A. G. McClintock and Paul B. Lorenz, Cheyenne, for appellant.

Francis P. O'Neill, Denver, Colo., William S. Edmonds, Kemmerer, and Carleton Lathrop, Cheyenne, for appellee.

Before BLUME, C. J., PARKER, J., and PEARSON, D. J.

Mr. Justice PARKER delivered the opinion of the court.

Plaintiff Vaughan B. Connelly sued A. C. Torgeson (and others who do not appear here) to quiet title in three Federal oil and gas leases. One of these has since expired and is not in issue. The other leases, Evanston 021741 and 021743,[1] in 1952 were owned by one Heintze who assigned an undivided one-half interest therein to plaintiff Connelly. This one-half interest is not contested in the present action. The remaining one-half interest in the two leases was assigned from Heintze to Davis and subsequently from Davis to Transco Gas and Oil Corporation. Transco on March 3, 1952, made an "operating" agreement with McElroy and Markey granting and subleasing the exclusive right to drill for oil and gas on certain lands, including the ones in issue here, with the provision that the sublessor would retain a 50 percent working interest in the lands and sublessees might elect to quitclaim as to certain portions of the lands and thereby be released from further obligations as to them. On May 19, 1952, McElroy sent this agreement to the Bureau of Land Management, U. S. Department of Interior, at Evanston, but the manager because of the termination of one of the leases mentioned therein and certain alleged wrong serial numbers on other leases returned that portion of the agreement which contained the only land description. On August 21, 1954, McElroy and Markey, with the consent of Transco, assigned all of their rights in the operating agreement with Transco to Torgeson, who recorded the assignment in Lincoln County but did not record the operating agreement with the attached exhibit containing the land description. Meantime, on June 5, 1953, Transco, ignoring its agreement with McElroy and Markey, executed unacknowledged assignments of its undivided one-half interest in each of the said leases to Austgen, which were placed of record in Sublette County on August 9, 1955. On August 11, 1955, Austgen executed unacknowledged assignments of his interest in the leases to plaintiff Connelly. These assignments were approved by the Bureau of Land Management on October 12, 1955, and placed of record in Lincoln County on November 2, 1957, *during the pendency* of this suit. Connelly claims the interest here in issue by reason of the assignments from Transco to Austgen and Austgen to him, while Torgeson claimed his interest by reason of Markey and McElroy's assignment of their operating agreement with Transco.

The district court gave judgment for plaintiff Connelly, quieting title in him, and defendant[2] has appealed, insisting that plaintiff failed to sustain the burden of proof, that defendant has legal rights in the leases, and that such rights are not dependent upon the Federal approval of the operating agreement. In the argument that plaintiff failed to sustain the burden of proof, defendant quotes § 66–119, W.C.S.1945, now § 34–20, W.S.1957:

"Every conveyance of real estate within this state, hereafter made, which shall not be recorded as required by law, shall be void, as against any subsequent purchaser or purchasers in good faith and for a valuable consideration of the same real estate or any portion thereof, whose conveyance shall be. first duly recorded."

Defendant emphasizes that if plaintiff intends to claim by reason of this statute he must show due recording of the conveyance from Austgen, the payment of valuable consideration for it, and purchase without

---

1. Evanston 021741 covered lands located in Lincoln and Sublette counties; Evanston 021743 covered lands located in Sublette County.

2. This term shall connote either A. C. Torgeson or the executrix of his estate who now stands in his stead.

notice or knowledge of the operating agreement.

 Defendant cites §§ 66–114, 66–116, 66–119, and 66–130, W.C.S.1945, now §§ 34–18, 34–21, 34–20, and 34–26, W.S.1957, which provide respectively that the conveyance be recorded in the county where the conveyed land lies, that it is notice to subsequent purchasers from the time of its delivery to the register, that every conveyance not recorded as required by law is void as against a subsequent purchaser in good faith for valuable consideration whose conveyance is first duly recorded, and that a register of deeds who shall record a conveyance not acknowledged is liable to a hundred dollar penalty. He argues:

"\* \* \* Under the clear provisions of our recording law they [the assignments from Transco to Austgen and Austgen to Connelly] were therefore not entitled to be recorded and acceptance and recording thereof \* \* \* was a violation of the law. Since the statute has protected only a subsequent purchaser who first *duly* records, it follows that plaintiff has not brought himself within the protection of the law and under no circumstances can he claim to be a bona fide purchaser. \* \* \*"

Defendant cites none of the authorities which support such a view by holding that constructive notice[3] is a creature of positive law, ineffectual unless within the provisions of the statute. 66 C.J.S. Notice § 6; 45 Am.Jur. Records and Recording § 108; Annotation, 59 A.L.R.2d 1299.

Constructive notice by recording is, as we pointed out in Dame v. Mileski, Wyo., 340 P.2d 205, 208, a matter entirely dependent upon statute.[4] This is true notwithstanding the fact that in some jurisdictions persons have been charged with constructive notice of matters which have not been

recorded in the manner provided by statute. One instance of this has occurred in California where the constructive notice has been accomplished by means of the statute regarding judicial'notice (§ 1875, Civil Procedure, West's Annotated California Codes, 1955) which provides:

"Judicial notice. Courts take judicial notice of the following facts:

\* \* \* \* \* \*

"3. Public and private official acts of the legislative, executive and judicial departments of this state and of the United States, and the laws of the several states of the United States and the interpretation thereof by the highest courts of appellate jurisdiction of such states."

This statute, broad as it is, has been enlarged by the courts of that jurisdiction in their holding that since they take judicial notice of the proceedings in Federal bureaus the litigants are likewise charged with constructive notice of such occurrences. Livermore v. Beal, 18 Cal.App.2d 535, 64 P.2d 987; Arnold v. Universal Oil Land Co., 45 Cal.App.2d 522, 114 P.2d 408. In Wyoming our statute does not permit courts to take judicial notice of the occurrences in Federal bureaus, and it would therefore be purposeless to speculate on the propriety of litigants being charged constructively with facts which a court can judicially notice. In any event, the Wyoming legislative provisions are definite that the filing or leaving of a conveyance in any office other than that of the register of deeds cannot constitute constructive notice.

 Lawyers and laymen alike have on occasion complained that, as to mineral rights, there is a lack of co-ordination between the State and the Federal Government which results in added efforts and expense for title examination. Specifically, they say that (1) mineral leases and assign-

---

3. "\* \* \* that notice which is fastened upon one by an irrefutable presumption of law, as by the recording of an instrument under the recording acts." Holmes v. Doe Run Lead Co., Mo.App., 223 S.W. 772, 779.

4. 5 Tiffany Real Property, 3 ed., p. 15; 5 Thompson on Real Property, 1924, p. 3 ff.

ments executed by the Federal Government are not acknowledged and therefore are not entitled to the required recording in the State and (2) the restricting of constructive notice to instruments of record in the offices of registers of deeds renders of little practical value the Federal land office filings which must nonetheless be carefully searched even though constructive notice which governs bona fide purchase *depends entirely upon the county recordings*. Should the legislature in the future be convinced of the validity of such complaints, it will undoubtedly change the recording law to meet the difficulties. Meanwhile, the courts have no alternative but to apply the existing statutory provisions to cases before them.

> "It is well settled that if an instrument required for recordation to be acknowledged is without an acknowledgment and is improperly admitted to record, the recordation does not afford constructive notice of the existence and contents of the instrument." Annotation, 59 A.L.R.2d 1299, 1302.

Condict v. Ryan, Wyo., 333 P.2d 684; North American Uranium, Inc., v. Johnston, 77 Wyo. 332, 316 P.2d 325. Under this rule, the recording by Connelly of the unacknowledged instruments by which he claims affords no constructive notice. It is therefore unnecessary that we give more than passing attention to a fact previously mentioned, viz., the assignments from Austgen to Connelly although recorded in Lincoln County were not placed of record in Sublette County, in which is located a substantial portion of the land in Evanston 021741 and all of the land in Evanston 021743.

■■■■ Defendant insists that plaintiff's promise to drill a well was not a valid consideration but merely an executory promise since Connelly did not even have a rig or contract for one until May of 1956 and there was no drilling until after Connelly had full knowledge of Torgeson's claims.

Defendant cites no authorities to substantiate this view, and we are doubtful if it is well taken. According to uncontradicted evidence, Connelly promised to drill the well in return for Austgen's promise to assign. Since Austgen reserved an overriding royalty the drilling was of substantial benefit to him. The assignment was effected immediately, but the well was not drilled until later. Ordinarily, where mutual promises are made, the one furnishes sufficient consideration to support the other. Eller v. Salathe, 44 Wyo. 369, 12 P.2d 386. However, in order that Connelly become a bona fide purchaser, there must not only have been a valuable consideration in fact but it must have been paid before notice of any prior claim. Dame v. Mileski, supra; 3 Pomeroy's Equity Jurisprudence, 5 ed., § 750; 55 Am.Jur. Vendor and Purchaser § 747; Annotation, 124 A.L.R. 1259. Accordingly, this case does not turn upon the question of whether or not there was consideration but upon the knowledge of an outstanding claim—assuming that Torgeson's claim was valid.

Plaintiff emphasizes paragraph sixteen of the operating agreement which provides that the operators may quitclaim as to any portion of the area and be thereby released from further obligation on such portion and indicates that the lack of mutuality prevents the agreement from conveying an interest in land. To support this position plaintiff quotes Sheehan v. Vedder, 108 Cal.App. 419, 292 P. 175, 178:

> "It has been held that an oil-drilling contract which gives to the prospective driller the right to quitclaim the property to his lessor before the discovery of oil, and thereby relieve himself from the obligations of his contract * * * is not mutual and therefore cannot be specifically enforced. * * *"

Although the court in the Sheehan case does not so state, § 3386, Kerr's Cyc.Code of California, 1920,[5] undoubtedly had a bearing

---

5. "Neither party to an obligation can be compelled specifically to perform it, unless the other party thereto has per-

formed, or is compellable specifically to perform, everything to which the former is entitled under the same obliga-

on this case and its predecessors in the stated view.

Mutuality of remedy under a contract as a prerequisite to an action for specific performance has long been a subject of debate among courts and legal writers. See Annotation, 22 A.L.R.2d 508. Although that annotation does not discuss the situation in Wyoming, this court has on occasion given some attention to the rights of a party having a contract for the transfer of title to realty during a certain period. Merrill v. Rocky Mountain Cattle Co., 26 Wyo. 219, 181 P. 964; Frank v. Stratford-Handcock, 13 Wyo. 37, 77 P. 134, 67 L.R.A. 571, 110 Am.St.Rep. 963. In both these cases Judge Potter indicated that there are exceptions to the general rule that as a prerequisite to specific performance there must be both mutuality of obligation and remedy. An excellent summary of the entire problem of the lack of mutuality of obligation or remedy is found in Vanzandt v. Heilman, 54 N.M. 97, 214 P.2d 864, 22 A.L.R.2d 497, which case is cited by the Supreme Court of Illinois in Gould v. Stelter, 14 Ill.2d 376, 152 N.E.2d 869. Both of these cases approve the view of Judge Cardozo in Epstein v. Gluckin, 233 N.Y. 490, 135 N.E. 861, 862, in which he said, "What equity exacts today as a condition of relief is the assurance that the decree, if rendered, will operate without injustice or oppression either to plaintiff or to defendant." 1A, Summers Oil and Gas, 1954, pp. 512, 513, states:

"* * * In at least three states specific performance of contracts to give an oil and gas lease has been refused where the lease, when made, was to contain a surrender clause, or a provision that it should be void if the lessee did not commence to drill within a stipulated time. It is said that there is no mutuality of obligation and that a court of equity will not compel an act by one party where the other is not bound. This view is erroneous. If it were followed, the result would be that

tion, either completely or nearly so * * *."

a contract to give an unless lease could never be specifically enforced. Yet, such leases are everywhere regarded as valid when made and have been the subject of specific performance. That the lessee must pay an initial consideration for the lease would seem to be a sufficient answer to the objection of lack of mutuality of obligation. As to the second objection, lack of mutuality of remedy, it is extremely unlikely that a lessee would go to the trouble and expense of a suit in equity in order to get a lease which he intended immediately to surrender or allow to become void by failure to drill. Furthermore, that is the contract to which the parties agreed, and there is no reason to deny specific performance of the agreement so long as the lessee has not in fact surrendered his rights."

In the light of the current trend which these authorities indicate, we would be reluctant to hold that there is a lack of mutuality in the operating agreement which would of itself preclude it from conveying an interest in land.

Plaintiff does not refer to the previous views of this court as to the status of oil and gas leases and royalty interests, but we think they are important. In Boatman v. Andre, 44 Wyo. 352, 12 P.2d 370, we said that the right created by an oil lease is to search for oil and gas and if either is found to remove it from the land, and from this it would appear to be a profit à prendre and hence an incorporeal hereditament. In Denver Joint Stock Land Bank of Denver v. Dixon, 57 Wyo. 523, 122 P.2d 842, 140 A.L.R. 1270, we held that a royalty interest in oil if of a permanent nature is ordinarily considered to be real and not personal property.[6] We noted Dutton v. Interstate Investment Corporation, Cal.App., 113 P.2d 492, and Arrington v. United Royalty Co., 188 Ark. 270, 65 S.W.2d 36, 90 A.L.R. 765, as holding that leases for a limited term of years had been held to be personalty, and

6. Approved by Hageman & Pond v. Clark, 69 Wyo. 154, 238 P.2d 919.

we postponed as unnecessary of decision a determination of whether or not a lease limited in time should be considered real or personal property. The Dutton and Arrington cases both held that leases for an indefinite term had been considered to be realty, the latter indicating that the term of the lease is indefinite if the contract provided "and so long as oil and gas is produced." In the instant case, we are concerned with an operating agreement existing for a term of twenty years and "so long thereafter as oil, gas, and other hydrocarbon substances are produced in commercial quantities," which agreement purports to grant and sublease the exclusive right to drill on the real estate in question in accordance with a lease from the United States Government. Although this is less than the royalty interest previously considered by us and less even than an oil and gas lease, it in effect conveys a portion of the lease or the rights thereunder and constitutes real property.

Although plaintiff did not so plead in the trial court, he argues here that defendant is barred by laches from asserting any claim of interest whatever in the land held by plaintiff. Defendant moved to strike the portion of plaintiff's brief dealing with this subject on the ground that it was presented here for the first time. We intentionally withheld ruling on the motion until a decision on the merits, having in mind the general rule that laches should be raised in the pleadings but being also aware that relief because of laches is not beyond the authority of the court sua sponte even though there is no pleading on which to base it. 19 Am.Jur. Equity § 515; 1 Bancroft's Code Pleading, 1926, p. 476. Plaintiff insists with considerable force that defendant is barred by laches from asserting any claim or interest whatever in the land held by plaintiff. He points out that Torgeson himself admitted that in 1954 he knew that he did not have record title to an interest in the leases and even so failed thereafter to record an instrument which would place anyone on notice and further that he had known for approximately a

period of three years that someone else had held the title to the land, all this in the light of the fact that Torgeson was an experienced oil operator, had had the records checked in the fall of 1954, and knew that there had been litigation on the title. Plaintiff cites Jackson v. Jackson, 4 Cir., 175 F. 710, 99 C.C.A. 286, and Willard v. Wood, 164 U.S. 502, 17 S.Ct. 176, 41 L.Ed. 531, as authority that he was not required to plead laches in order to take advantage of them. He relies on Naddo v. Bardon, 8 Cir., 51 F. 493, 2 C.C.A. 335, and Twin-Lick Oil Company v. Marbury, 91 U.S. 587, 23 L.Ed. 328, for the principle that the laches doctrine is especially applicable to oil and gas situations wherein the value of the rights varies widely from time to time. He relies also on Johnston v. Standard Mining Company, 148 U.S. 360, 13 S.Ct. 585, 37 L.Ed. 480, for the principle that a party is chargeable with such knowledge as he might have obtained upon inquiry, providing the facts already known to him were such as to put upon a man of ordinary intelligence the duty to inquire. Plaintiff argues that Torgeson:

" * * * is sitting quietly on the sidelines with an agreement which is totally void, of which the plaintiff Connelly took with no notice, waiting until such time as this property which was utterly valueless and could be considered as nothing more than grazing land, until such time as it had been developed, had been made extremely valuable by the courage and the aggressiveness of one man going in there and financing all of that with his own money and now the defendant Torgeson would come in and assert that he had some right, title and interest in and to that once the property has been proven extremely valuable."

The diligence which courts require in the enforcement of one's rights if he is to avoid laches assumes that there is knowledge of an adverse claim. In the present case neither of the parties had duly recorded in the counties in which the lands were situated any instrument by which ti-

tle was claimed. Plaintiff Connelly did not at any time duly record the instruments by which he claims title in the counties in which the lands were situated, and the instrument recorded by defendant Torgeson carried no description. Neither of the parties having properly recorded so as to give constructive notice to the other, the question of laches must depend upon actual knowledge. Torgeson said he had no knowledge of Connelly's claim until the time of the suit although in 1954 he called Markey and said, "there is a man by the name of Austgen has got them two leases, how the Dickens is that?" Markey in his testimony, after explaining that his former associate, McElroy, was deceased, said that he had not received any communication from Transco of a purchase by Austgen and that he had no knowledge of that assignment until sometime in the fall of 1954, over a year after it had been made. There was no evidence to show that Connelly had any actual knowledge of Torgeson's claim until the time the suit was filed although counsel argue that defendant filed a notice and copy of the operating agreement with the Bureau of Land Management October 4, 1955. Torgeson said that he made no payment of rentals on the leases to the United States Government and gave as his excuse for nonpayment the fact that the leases were under litigation. Connelly testified that he paid all rentals on the leases not paid by Austgen or Transco. Plaintiff's argument that defendant is guilty of laches because he did not pay the rentals on the leases and sat idly by while he, the plaintiff, drilled and developed the land is not borne out by the cases which he cites. In the first place, Connelly had a substantial unchallenged interest in the leases, the protection of which would substantially benefit him. In the second place, Torgeson had prior to Connelly's expending any substantial amounts made clear by pleadings in this case the nature of his claims. The charge of laches is not valid under the circumstances here.

■ The owners of undivided portions of oil and gas rights in and under real estate are tenants in common and each of them may enter upon the premises to explore for and develop gas and oil. One of them cannot exercise such right to the exclusion of the other, and the one who does proceed must account to a nonconsenting cotenant for the pro rata share of the net profits to be determined by deducting from the amount received the necessary expense of exploring, developing, extracting, and marketing. Earp v. Mid-Continent Petroleum Corporation, 167 Okl. 86, 27 P.2d 855, 91 A.L.R. 188; Essley v. Mershon, Okl., 262 P.2d 417; Annotation, 91 A.L.R. 205.

■■ Troublesome legal problems often become more susceptible of solution by the analysis of the pleadings and proof, which is requisite to a determination of the action taken by a trial court. The burden of defendant's appeal centers upon the alleged failure of plaintiff to sustain the burden of proof under his petition so as to make out a prima facie case. It is well settled that this court should not disturb the finding of a trial court if there is substantial evidence upon which the judgment can be based. United States Fidelity & Guaranty Co. v. Cook, 43 Wyo. 356, 5 P.2d 294; Rainsford v. Massengale, 5 Wyo. 1, 35 P. 774. Moreover, the judgment of the trial court is presumed to be correct, and the one appealing therefrom must make an affirmative showing of error. Peterson v. Johnson, 46 Wyo. 473, 28 P.2d 487, 91 A.L.R. 723; O'Mally v. Eagan, 43 Wyo. 233, 2 P.2d 1063, 77 A.L.R. 582; Id., 43 Wyo. 350, 5 P.2d 276, 77 A.L.R. 582.

In his petition, plaintiff alleged that he had a leasehold interest in the described lands by virtue of ownership of the Federal leases, that he was in possession of the land, that the defendant without foundation claimed some right adverse to plaintiff, and prayed adjudication of the rights of all parties to the action. Defendant filed answer and counterclaim, denying plaintiff's full ownership, alleging an interest in the oil and gas leases and the lands

thereby covered by reason of an assignment to him of the McElroy-Markey operating agreement, and praying a decree determining his rights in the property. The parties stipulated as to the execution of the instruments by which each claimed title. Additionally, plaintiff offered testimony regarding each of the instruments under which he claimed. He testified that from 1952 to 1955 he paid the lease rentals on one-half of the two leases, that Transco paid the other half until 1953, that Austgen paid that half of the rentals from 1953 to 1955, and that in 1955 Connelly paid the full rental; that he had certain employees and a pipe yard with an inventory of approximately $40,000 in that area; that in April 1956 he executed a bond to the United States Government covering Evanston 021741; that he contracted for a driller on that property; that the driller did not show up; that he secured another in June, had him move on, experienced some mechanical difficulty, secured another rig, and finally completed a well to validate the lease about September 1 of that year, at which time the lease would otherwise have expired; that he drilled upon 021743, completing the first well on February 28, 1957; that shortly thereafter General Petroleum drilled a deeper well on adjoining property and brought in a large producer; that he accordingly was forced to drill a number of off-set wells on the leases in issue to protect the property; and that at the time of the hearing he had expended over $750,-000 on the leases which were then in production with royalties being paid thereon.

We look next at the evidence which defendant presented to defeat plaintiff's claim and to establish his own. Torgeson told of the assignment on August 21, 1954, of the operating agreement to him and Transco's consent thereto. He said that he knew nothing of Austgen's interest at that time; had not filed a copy of the operating agreement in either Lincoln or Sublette counties;

had filed in Lincoln County a copy of the assignment and the consent of Transco; had filed a copy of the operating agreement with the Bureau of Land Management in August 1955; did not pay the rentals on the leases because they were in litigation [7] and furthermore he had not received any written demand from Transco or Austgen to pay them. He said that in the fall of 1954 he discovered that Transco had not delivered all the property which the officials claimed it had so he called Markey and inquired about it; did not make any claim or demand on the property because his attorneys had advised him that it was unnecessary to do so. He stated he could never get in touch with Connelly although he indicated he had attempted to. Markey testified to the execution of the operating agreement. He also testified regarding its assignment to Torgeson and said that at that time he had no knowledge of the assignment by Transco to Austgen. He said that he had never paid any rentals on the leases in question and said as long as there was any litigation whatsoever they were not required to perform under the operating agreement although he admitted that the leases here in question were not in litigation in 1953 and 1954.

A copy of the agreement of March 3, 1952, from Transco to McElroy and Markey was placed in evidence by Torgeson pursuant to stipulation. Paragraph twenty-one of that instrument read:

"This agreement shall not be assignable in whole or in part by Operators except that Transco hereby expressly consents to the assignment by Operators of their interest in this Agreement to a duly organized corporation formed and controlled by Operators for the purpose of carrying out the obligations of Operators hereunder. *Any further assignment in whole or in part by Operators or their corporate assignee*

---

7. Paragraph seventeen of the operating agreement provided, "The obligations of Operators thereto shall be suspended while Operators are prevented from complying therewith in whole or in part * * * by litigation in any court affecting said lands."

*shall be effective only upon obtaining the prior written approval of Transco and the Department of the Interior, if the same is required. * * *"* ·(Emphasis supplied.)

There was no contention by defendant that the written approval of the Department of the Interior had ever been obtained.

The abstracts admitted without objection showed that the assignments from Transco to Austgen were executed on June 5, 1953; those from Austgen to Connelly, August 11, 1955. The assignment from McElroy and Markey to Torgeson was dated August 21, 1954. If we give plaintiff's evidence every favorable inference which may be drawn therefrom,[8] there was ample basis for the trial court to have reasoned:

Transco was the common source of title. The first instrument by which it purported to divest itself of certain rights in the leases was the operating agreement on March 3, 1952. It assigned to Austgen on June 5, 1953, and on August 21, 1954, it approved an assignment of Markey and McElroy to Torgeson. Since none of these instruments were properly recorded, the common law rule applies between claimants, "prior in tempore potior est in jure" (He who is first in time has the better right).[9]

Such reasoning would have warranted a determination that Transco prior to the time it approved Markey and McElroy's assignment to Torgeson had divested itself of all rights in the leases in issue,[10] even though such divesting was contrary to the express provision in the operating agreement,[11] so that any approval of the assignment was without effect.

There was also justification for the court to have found that paragraph twenty-one of the operating agreement, which provided that further assignment should be effective only upon the obtaining of the written approval of the Department of the Interior prevented title from having reposed in defendant under the facts stated. It is argued with some force that 30 U.S.C.A. § 187, 41 Stat. 449, providing that no lease by the Government for oil and gas lands shall be assigned or subleased except with the consent of the Secretary of the Interior, is for the benefit of the Government and a party can take no advantage of the regulation to defeat an assignment. Aronow v. Bishop, 107 Mont. 317, 86 P.2d 644, and Dougherty v. California Kettleman Oil Royalties, Inc., 9 Cal.2d 58, 69 P.2d 155, are cited to substantiate this view which is contrary to that expressed in Oasis Oil Co. v. Bell Oil & Gas Co., D.C.Okl., 106 F. Supp. 954, holding that until the approval of the Department of the Interior was forthcoming an assignee did not receive an interest in a controverted lease. It is, however, unnecessary for us to determine the correctness of this rule since the provisions in an instrument by which one attempts to take title undoubtedly establish obligations which are effective independently of any statutory provision, and the statement in paragraph twenty-one of the operating agreement may well have motivated the trial court in its judgment.

8. Jacoby v. Town of City of Gillette, 62 Wyo. 487, 174 P.2d 505, 177 P.2d 204, 169 A.L.R. 502.

9. State ex rel. State Highway Commission v. Meeker, 75 Wyo. 210, 294 P.2d 603.

10. The abstracter indicated uncertainty as to reservation of overriding royalty on Evanston 021743.

11. "20. In the event that Transco receives a bona fide offer to purchase its interests in said lands, and to make an assignment of said leases, Transco agrees first to submit such offer to Operators in writing, at the offering price, and Operators shall have thirty days within which to elect and purchase and take such assignment upon like terms. In the event Operators do not avail themselves of this right to purchase, Transco may not sell or assign their leases at a lesser price than the one submitted to Operators without again allowing Operators the same period of time to purchase said leases at the new and lesser price."

Defendant insists that even though something remains to be done before he will have a perfect, unqualified estate in the sublease that there is some interest which had been vested in him prior to the trial. He continues by urging that the intent of the parties should control and that defendant's taking possession of certain areas covered by other leases indicated the intention of the parties that the consent of the Department of the Interior be a condition subsequent. He argues further that the operating agreement and the assignment thereof are integral instruments so that if there are rights as to one lease mentioned in the operating agreement there is a right to all leases. Even if we should assume that the operating agreement applies equally to all leases and is not effective to one unless it is to the other, there is no authority or persuasive argument here to show that the transfer of title was effective as to any of the leases covered by the operating agreement. We think that defendant's view on this point is not well taken and no authorities are cited to substantiate his contention. Evidence regarding the actual possession of the land at the crucial times was somewhat obscure, and the only testimony as to constructive possession was that regarding Connelly's payment of the lease rentals. Nevertheless, we think that there was sufficient evidence upon which the judgment of the trial court could stand. Moreover, defendant's evidence failed to establish affirmatively any right which he had to the leases and discloses that the interest of any assignee was not to be effective until the approval of the Department of the Interior had been obtained.

We have often said that a plaintiff in a suit to quiet title must recover on the strength of his own title and not on the weakness of his adversary, but as pointed out in York v. James, 62 Wyo. 184, 165 P.2d 109, 162 A.L.R. 730, this rule is inapplicable where the parties trace their respective titles to a common source, in which situation the plaintiff need not show his title good as against the whole world but only against the defendant, and the one who has the superior title or equity must prevail.

Since the evidence before the trial court was sufficient to justify the court's findings and there is no showing of prejudicial error, the judgment of the trial court must be affirmed.

Affirmed.